2023 PA Super 140

| | | |
|---|---|---|
| JASMINE CARRERO | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| AUBEEN LOPEZ | : | No. 1606 MDA 2022 |

Appeal from the Order Entered October 19, 2022,
in the Court of Common Pleas of Lackawanna County,
Civil Division at No(s):  2018-FC-40385.

BEFORE:  PANELLA, P.J., OLSON, J., and KUNSELMAN, J.

OPINION BY KUNSELMAN, J.:          **FILED: JULY 28, 2023**

Jasmine Carrero (Mother) appeals the decision of the Lackawanna County Court of Common Pleas, which denied her request to relocate from Pennsylvania to Florida with the parties' 7-year-old daughter, L.L., and 1-year-old son, J.C. (the Children).  Aubeen Lopez (Father), a resident of Rhode Island, opposed Mother's request.  Mother argues ***inter alia*** that the trial court's findings under the Child Custody Act constituted an abuse of discretion.  ***See*** 23 Pa.C.S.A. § 5337(h).  After careful review, we agree and reverse the trial court's decision.

The facts of this case are largely undisputed.  Neither Mother, nor Father has extensive connections with Pennsylvania.  In 2017, Mother moved in with her parents, who temporarily resided in Lackawanna County.  Since then, her parents returned to Florida.  In 2018, Mother filed a custody action

in Lackawanna County against Father, who was then a resident of New York City. Pursuant to an agreed upon order, Mother received primary physical custody of L.L. Father was awarded partial custody on alternating weekends. For a short period in 2020, the parties reconciled. During this reconciliation, Mother and Father lived together in Bayonne, New Jersey. The parties broke up several months later, but not before Mother became pregnant with J.C. After the break-up, Mother returned to Pennsylvania with the Children.

The parties then sought to update the custody order. By agreed-upon interim order, dated July 23, 2021, the trial court kept primary physical custody with Mother and awarded Father "visitation with the minor children" every Friday from 4:00 p.m. until 7:30 p.m., and every Saturday from 10:00 a.m. until 1:00 p.m.[1] The court also directed Father to obtain reunification therapy regarding L.L.

A month later, the court extended Father "periods of visitations" with the Children each Friday from 4:00 p.m. to 7:30 p.m. and on alternating weekends from Friday at 4:00 p.m. until Sunday at 2:00 p.m. In November 2021, the court further awarded Father custodial time with the Children during Thanksgiving and Christmas of 2021. That custody order provided:

> All additional visits will be worked out by the parties after consultation with [L.L.'s] therapist. It is **FURTHER**

---

[1] Following the 2011 revisions to the Child Custody Act, our custody law no longer provides a statutory basis to seek "visitation." Instead of "visitation," 23 Pa.C.S.A. § 5323(b) provides for: partial physical custody; shared physical custody; or supervised physical custody. It is apparent that Father was awarded partial physical custody.

- 2 -

> **ORDERED** that Natural Father shall reach out to the minor child's therapist at the Aaron Center and begin family reunification with the child.

Order, 11/22/21 (emphasis in original).[2]

At the end of the following summer, in August of 2022, Father began attending law school in Rhode Island. He continued to exercise his partial custody in New York, where his extended family lived. That same month, Mother notified Father of her proposed relocation with the Children to Largo, Florida – specifically to a housing complex where she alleged that many of her relatives resided. Father objected to the proposed relocation. On September 1, 2022, Mother filed a formal petition for relocation and to modify custody. After a virtual hearing on September 29, 2022, by order dated October 19, 2022, the trial court denied Mother's petition for relocation. Mother timely filed this appeal.

Mother presents the following issues for our review, which we have re-ordered for ease of disposition:

> 1. Did the trial court commit an error of law by failing to properly weigh the relocation factors in light of [**Gruber v. Gruber**, 583 A.2d 434 (Pa. Super. 1990)] and related case law?
>
> 2. Did the trial court commit an error of law by imposing on [Mother] the requirement to demonstrate a

---

[2] Mother explained that L.L. no longer receives therapy from the Aaron Center but from "SBBH," an agency that provides counseling at both school and home. Mother provided no further description of "SBBH," and the record reveals none. N.T., 9/29/22, at 12-13, 20.

separate benefit to the Children, although the significant benefit flowing from [Mother, as the] custodial parent, had been established?

3. Whether the trial court abused its discretion when deciding that the shifting visitation arrangements defeated the proposed move which offers "significant" financial and emotional benefits to [Mother, as the] primary custodial parent?

4. Whether the trial court committed an error of law and abuse of discretion by denying [Mother's] relocation petition?

5. Whether the trial court, by its order dated October 19, 2022, erred in failing to consider the best interest [] factors, as described by the Legislature in 23 Pa.C.S.A. § 5328(a)?

Mother's Brief at 4-5 (style adjusted).

Mother's first four appellate issues present two distinct, but interconnected challenges to the trial court's decision. First, Mother reasons that the court had to apply Section 5337(h) in accordance with *Gruber* (and its progeny), which was decided before the Legislature enacted the current iteration of the Child Custody Act in 2011. Failing that, Mother argues that the court's conclusions under Section 5337(h) of the Child Custody Act constituted an abuse of discretion. In her final appellate issue, Mother argues the court erred when it failed to analyze the custody factors under Section 5328(a).

Our discussion begins with Mother's argument that *Gruber* still governs, notwithstanding the enactment of Section 5337. To resolve this claim, we abide by the following scope and standard of review:

> The interpretation and application of a statute is a question of law that compels plenary review to determine whether the trial court committed an error of law. As with all questions of law, the appellate standard of review is *de novo* and the appellate scope of review is plenary.

*E.C.S. v. M.C.S.*, 256 A.3d 449, 454 (Pa. Super. 2021) (citation omitted).

The crux of Mother's argument is this: because Section 5337 codified the three-factor test from *Gruber*, that case and its progeny remain good law. And under a *Gruber* analysis, the primary focus is whether relocation would benefit the parent. According to Mother, because the trial court determined that she would benefit from relocation, it had to grant her relocation petition, and it erred when it failed to do so.

When this Court decided *Gruber*, the prior iteration of the Child Custody Act was in effect. *See* 23 Pa.C.S.A. §§ 5301-5315 (Repealed). Section 5308 of that Act addressed the relocation of a party or a child as follows:

> If either party intends to or does remove himself or the child from this Commonwealth after a custody order has been made, the court, on its own motion or upon motion of either party, may review the existing custody order.

23 Pa.C.S.A. § 5308 (Repealed).

In *Gruber*, our Court then set forth the following three-factor test to resolve relocation cases:

> First, the court must assess the potential advantages of the proposed move and the likelihood that the move would substantially improve the quality of life for the custodial *parent and the children* and is not the result of a momentary whim on the part of the custodial parent.
>
> […]

- 5 -

> Next, the court must establish the integrity of the motives of both the custodial and non-custodial parent in either seeking the move or seeking to prevent it.
>
> […]
>
> Finally, the court must consider the availability of realistic, substitute visitation arrangements which will adequately foster an ongoing relationship between the child and the non-custodial parent.

*Gruber*, 583 A.2d at 439 (emphasis added).

As for the first *Gruber* factor, this Court later clarified that a parent seeking relocation was not required to show an independent benefit to her children apart from a substantial improvement in the parent's quality of life. *See Anderson v. McVay*, 743 A.2d 472, 475 (Pa. Super. 1999); *see also Baldwin v. Baldwin*, 710 A.2d 610, 614 (Pa. Super. 1998); *and see Zalenko v. White*, 701 A.2d 227, 229 (Pa. Super. 1997). The idea was, if the relocation benefitted the parent, then the parent's benefit would automatically "flow to the children." *Anderson*, 743 A.2d at 475 (citing *Gruber*, 583 A.2d at 439).

In 2011, our Legislature enacted the revised Child Custody Act, which included detailed legal standards for deciding relocation cases. *See* 23 Pa.C.S.A. § 5337; *see also generally* §§ 5321-5340. Specifically, Section 5337(h)(1)-(10) "expanded upon [the *Gruber* factors] and broadened the areas of inquiry that a trial court must consider when ruling on a relocation request." *Commonwealth v. Childs*, 142 A.3d 823 (Pa. 2016) (citing *E.D. v. M.P.*, 33 A.3d 73, 79 (Pa. Super. 2011)). Each of the three *Gruber* factors

has an equivalent in Section 5337. The first **Gruber** factor correlates to Section 5337(h)(6) and (h)(7). The second **Gruber** factor, correlates to Section 5337(i) (Burden of proof). The third **Gruber** factor correlates to Section 5337(h)(3).

Although the text of the **Gruber** factors is substantially similar to their statutory equivalents, there are critical differences between the analyses. Previously, under the first **Gruber** factor, any benefit to the parent automatically flowed to the child; if relocation was good for the parent, it was good for the child. **See Anderson**, 743 A.2d at 475; **see also** Mother's Brief at 12-13. The inquiry was singular. Now, under Section 5337(h), the inquiry regarding the parent's benefit is a **separate** inquiry from the child's benefit. **See** 23 Pa.C.S.A. § 5337(h)(6) ("Whether the relocation would enhance the general quality of life for the **party**…") **cf.** § 5337(h)(7) ("Whether the relocation would enhance the general quality of life for the **child**…") (emphasis added).

Moreover, the two analyses also differ in scope. This Court recognized the distinction within months of the Legislature's enactment of the revised Child Custody Act:

> Section 5337 also **alters** the legal standards that a trial court must consider when ruling on a request to relocate. […] In particular, while the **Gruber** test required consideration generally of the "potential advantages of the proposed move and the likelihood that the move would substantially improve the quality of life for the custodial parent and the children" **Gruber**, 583 A.2d at 439, subsection 5337(h) sets forth **a number of specific factors** intended to isolate and focus this important inquiry.

- 7 -

*E.D.*, 33 A.3d at 79 (emphasis added).

Here, Mother acknowledges that Section 5337 represents the codification of *Gruber*. But she does not acknowledge how Section 5337 – specifically (h)(6) and (7) – broadened the prior *Gruber* analysis.[3] Mother actually goes a step further and argues that *Gruber* (and its progeny) is still binding authority, "because the Legislature did not overturn *Gruber.*" *See* Mother's Brief at 10.

By reasoning that *Gruber* must apply, notwithstanding the revision to the Child Custody Act, Mother's argument writes Section 5337(h)(7) completely out of the rulebook, and in fact, undermines the entire broadening of the relocation analysis, as intended by the Legislature. *See E.D.*, 33 A.3d at 79. As noted herein, there is clearly a conflict between the plain language of the statute and the prior *Gruber* analysis. When such a conflict exists, we have held that the case law falls by the wayside and the statutory provisions remain.

_____

[3] Mother's argument on this point is specious. Mother cites our Supreme Court's decision in *Childs* but omits the High Court's acknowledgment that *Gruber* was superseded by statute. *See* Mother's Brief at 10. *Childs* was a criminal matter concerning evidentiary presumptions. It referenced *Gruber* only in passing and by way of analogy. But even in that short excerpt, the Court not only explained that the revised Child Custody Act replaced *Gruber*, but the Court also included a pinpoint citation to *E.D.*, (quoted *supra*) which explained precisely how the Act superseded the *Gruber* analysis. *See Childs* 636 A.3d at 832 (citing *E.D.*, 33 A.3d at 79).

Our decision in another post-2011 Child Custody Act case demonstrates the point perfectly. *See P.J.P. v. M.M.*, 185 A.3d 413, 429 (Pa. Super. 2018). In *P.J.P.*, we addressed whether our decision in *Wiseman v. Wall*, 718 A.2d 844 (Pa. Super. 1998) was still good law following the 2011 revision to the Child Custody Act. *Wiseman* employed a four-factor analysis to determine whether a trial court should enter a shared custody award. Importantly, *Wiseman* also stood for the proposition that a trial court must make a finding that the parties were able to cooperate before the court could award shared custody. *Wiseman*, 718 A.2d at 849; *see also Yates v. Yates*, 963 A.2d 535, 542 (Pa. Super. 2008).

In *P.J.P.*, we first noted that each of the *Wiseman* factors had an equivalent under Section 5328(a), and thus we concluded that the *Wiseman* factors had been subsumed by the Section 5328(a) analysis. Critically, we also concluded that the *Wiseman* mandate about minimal cooperation contradicted the plain language of the current iteration of the Child Custody Act. *P.J.P.*, 185 A.3d at 420. We explained that Section 5328(a) does not require certain threshold findings before a court may award shared custody. Under the current Act, courts must now consider all relevant factors, including the "ability of the parties to cooperate," when making an award of any form of custody; poor cooperation would not necessarily be dispositive. Simply put, "the enactment of Section 5328(a) rendered the *Wiseman* analysis obsolete." *Id.*; *see also M.J.M. v. M.L.G.*, 63 A.3d 331, 339 (Pa. Super. 2013) (holding primary caregiver doctrine, "insofar as it required positive emphasis on the

primary caretaker's status," was no longer viable after the enactment of Section 5328).

In short, we held that **Wiseman** was no longer good law, even though its factor analysis was substantially similar to portions of the Section 5328(a) analysis. Because the sixteen-factor statute broadened the focus of a custody inquiry, the **Wiseman** mandate concerning minimal cooperation no longer comported with the plain language of the statute. **Wiseman** was superseded by statute and cast aside.

What **Wiseman** was to **P.J.P.**, **Gruber** is to this matter. As in **Wiseman**, **Gruber** contained a factor analysis that has been subsumed by the current Child Custody Act. As in **Wiseman**, the **Gruber** analysis does not comport with the broadened statutory inquiry. Just as **Wiseman** was rendered obsolete by Section 5328(a), the **Gruber** analysis was rendered obsolete by Section 5337(h).

To be sure, the Child Custody Act did not automatically render obsolete **all** prior case law. A custody decision pre-dating the 2011 revision – even one concerning **Gruber** – might hold its value; but the plain terms of the statute must always come first. If there is a conflict, the statute prevails.[4] Based on

---

[4] For instance, in **D.K. v. S.P.K.**, 102 A.3d 467, 472 (Pa. Super. 2014), this Court relied on a pre-2011 case, **Clapper v. Harvey**, 716 A.2d 1271 (Pa. Super. 1998), for guidance about when to apply the statutory relocation factors. **Clapper** held that the **Gruber** factors applied even though neither parent sought to relocate, and only the children stood to move. Thus, in **D.K.**, we applied the same logic and held that the Section 5337(h) factors applied

*(Footnote Continued Next Page)*

these reasons, we conclude the trial court did not err when it analyzed the Section 5337(h) factors without applying **Gruber**. Mother's arguments to the contrary have no merit.

Having clarified the application of Section 5337(h), we review Mother's secondary challenge to the court's decision – namely, that the court's conclusions constituted an abuse of discretion.

Section 5337(h) provides:

> In determining whether to grant a proposed relocation, the court shall consider the following factors, giving weighted consideration to those factors which affect the safety of the child:
>
> (1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.
>
> (2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.

---

in the same factual circumstance. Although we were guided by **Clapper** – and, by proxy **Gruber** – we recognized that Section 5337(h) superseded the prior case law. **D.K.**, 102 A.3d at 472.

In **S.T. v. R.W.**, 192 A.3d 1155, 1168 (Pa. Super. 2018), we concluded that Section 5328(a)(16) ("any other relevant factor") mandates the consideration of the "**Etter** factors," which are criteria to determine whether an incarcerated parent should be awarded supervised physical custody. **See also Etter v. Rose**, 684 A.2d 1092, 1093 (Pa. Super. 1996). Although **Etter** predated the Custody Act's 2011 revision, we concluded that the **Etter** factors were *per se* relevant under Section 5328(a)(16) in matters regarding incarcerated parents.

(3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.

(4) The child's preference, taking into consideration the age and maturity of the child.

(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10) Any other factor affecting the best interest of the child.

23 Pa.C.S.A. § 5337(h)(1)-(10).

Because Mother was the party proposing relocation, she had the burden of proving that relocation would serve the Children's best interests. *See* 23 Pa.C.S.A. § 5337(i)(1). In addition, "[e]ach party has the burden of establishing the integrity of that party's motives in either seeking the relocation or seeking to prevent the relocation." 23 Pa.C.S.A. § 5337(i)(2).

The relevant scope and standard of review governing these claims is as follows:

- 12 -

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*D.K. v. S.K.*, 102 A.3d at 478 (citation omitted).

The abuse of discretion standard is highly deferential to the trial court. The evidentiary record of a custody appeal will often support a conclusion different than the one reached by the lower court. In a custody appeal, the sheer fact that a trial court could have found for the appellant is not a sufficient basis to reverse the court's decision. Deference must be given to the trial court, who viewed the parties, the witnesses, and the evidence firsthand. *D.K.*, 102 A.3d at 478. It is not the role of this Court to "re-find facts, re-weigh evidence, and re-assess credibility." *Wilson v. Smyers*, 285 A.3d 509, 520 (Pa. Super. 2022) (citation omitted). Our role is simply to review the record in light of the trial court's findings. We must accept the findings of the trial court, so long as those findings are supported by competent evidence of record. *Wilson*, 285 A.3d at 515. Deferential though it is, this standard of review permits this Court to make our own inferences and deductions.

"Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record." *D.K.*, at 478.

Upon review, we reach the rare holding that the trial court's conclusions were indeed unreasonable as shown by the evidence of record. The trial court weighed subsections 5337(h)(1), (3), (7), and (10) in Father's favor, and (6) in Mother's favor. The court weighed subsection (8) evenly between the parties, and it found the remaining factors to be inapplicable. *See* Trial Court Opinion, 10/19/22, (T.C.O.) at 5-8.

Section 5337(h)(1) mandates that the trial court consider: "The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life." The court found that "Father has a close and loving relationship with L.L. and J.C. and is involved in the Children's lives to the extent permitted by his work/school schedule. Additionally, the Children have a relationship with paternal relatives who live in New York." T.C.O. at 5.

While we do not question that Father loves the Children, the trial court's other findings under this subsection contribute to the unreasonableness of its decision. The court's findings were wholly silent as to the Children's relationship with Mother, who has exercised primary custody since the parties' separation. The court did not address Father's irregular exercise of partial custody, except to credit him for seeing the Children as much as his work and school "permitted." Father also conceded he does not fully exercise his partial

- 14 -

physical custody rights. He explained that he is an Uber driver in New York City and, with Mother's consent, "I started […] [exercising custody] on Mondays because […] I can work Friday, Saturday and Sunday and get bonuses for the weekend, they have weekend bonuses, and I'd pick [the children] up on Monday." N.T. at 44, 46. In addition, Father testified that he did not exercise his full weekend custody rights due to his busy class schedule in the spring semester of 2022, which was his final semester of college before graduation. ***See id.*** at 46. However, with respect to exercising custody, Father stated, "I had extra days, like, for birthdays, […] I've had her for, you know, ten days in July…." ***Id***. at 46.[5] Father also conceded he never began reunification counseling with L.L., pursuant to the existing custody order. ***Id.*** at 66-67

Under this same subsection, the trial court considered the Children's relationship with "other significant persons" in their lives. ***See*** 23 Pa.C.S.A. § 5337(h)(1). The court found that "the children have a relationship with paternal relatives who live in New York." Father testified that L.L. is "best friends" with her paternal cousin with whom she shares a birthday one month apart. N.T., at 49. Father explained that, when he exercises overnight custody, he allows L.L. to stay in his brother's house so that she can be with her cousin, and then he returns the following morning to spend time with L.L.

---

[5] Father did not clarify whether he exercised custody of both children or only L.L. for ten days in July.

*Id*. Mother confirmed that this paternal cousin of L.L. lives in Brooklyn, and L.L. often "facetimes" with the cousin. *Id*. at 38-39.

The trial court made similar findings under Section 5337(h)(7) ("Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity"). The court reasoned that the Children "would be removed from Father and the paternal relatives for extended periods of time." *See* T.C.O. at 6-7.

We do not disturb these findings. Still, these findings contribute to the unreasonableness of the court's ultimate decision. Not only was the trial court silent as to Mother's relationship with the Children, but the court was also silent as to the Children's relationship with their maternal relatives, who live where Mother seeks to relocate and with whom the Children also share a close bond. Mother testified to L.L's relationship with L.L.'s maternal cousins:

> Q: Could you tell the [c]ourt a little bit about [L.L.] and [J.C.]'s relationship with your extended family that lives in Florida?
>
> A: It's close. […] [L.L.] is very close with my mom and with my dad and with my sisters and brothers and also with her cousins, especially my little brother who used to live next door to me. She was very close with his kids and his wife. I mean, she speaks to them virtually almost every day.

N.T., at 9-10.

Mother further explained that L.L. and J.C. have a lot of maternal cousins in Florida. *Id*. at 16. Specifically, she stated that one of her brothers has four

children, and her other brother has one child. *Id*. Mother also asserted that her sister has children with whom L.L. has a close relationship. *Id*. at 38. Mother explained that L.L.'s relationship with her maternal cousins has been, by necessity, largely virtual:

> [L.L.] is pretty close to all of them. [...] She's also in constant communication with them. She talks to them. They're always playing on [Roblox] or whatever little game that they are playing on their tablets. It's an all[-]the[-]time thing. She doesn't get to see them, so, you know, virtually that's how they see each other.

*Id*. at 16. In fact, Mother testified that L.L. "streams" with her maternal cousins on her tablet after school when she finishes her homework. *Id*. at 38.

We reiterate that it's not our role to re-weigh evidence. In that respect, we do not second-guess the trial court, or otherwise treat this aspect of the court's findings as a "battle of the cousins." What makes these findings under this Section 5337(h)(1) and (7) unreasonable, is that the paternal family does not live in Lackawanna County, but in the New York City area. Thus, relocation would not "remove the Children" from them since they do not live nearby. Along the same lines, the record indicates that the Children do not have a connection with other kids in their community. Although there are kids in Mother's Lackawanna County neighborhood, she explained that L.L. does not play with them. *Id*. By contrast, relocation would allow the Children to have regular, if not daily, contact with their maternal cousins.

Next, we review the trial court's findings under Section 5337(h)(2) ("the age, developmental stage, needs of the child and the likely impact the

- 17 -

relocation would have on the child's physical, educational, and emotional development, taking into consideration the special needs of the child"). Mother maintains that the court failed to consider J.C.'s diagnosis of Stickler's Syndrome. Under Section 5337(h)(2), the court reasoned that since the Children "were not produced at the relocation hearing" it was "unable to assess the applicability of this factor." T.C.O. at 5.[6] Similarly, in Section 5337(h)(7) (relating to the benefit to the children), the court stated: "Unfortunately, Mother has failed to establish how the move to Florida will enhance the general quality of life for [the] Children." *Id.* at 7.

Again, these conclusions contribute to the unreasonableness of the court's decision. Mother testified that she, J.C., and J.C.'s adult half-brothers all suffer from Stickler's Syndrome. *See* N.T. at 10. Mother explained that this disease "affects the tissues in the body. [It] affects your eyesight, your hearing, your joints. […] Usually have certain facial features that come with that." *Id*. Mother stated that her own eyesight is affected by Stickler's Syndrome, which contributes to her lack of a driver's license. Mother testified that she has had eye surgery and needs her physician to confirm that it will be safe for her to drive. *Id*. at 27. Mother did not specify when her eye surgery occurred, but she stated that prior to the surgery she had certain driving restrictions. *See id.*

_____

[6] It is unclear what J.C., who was approximately 15 months old at the time of the hearing, could have contributed to the record about his own medical needs.

Mother testified that J.C. "requires a lot of eye appointments, retina doctors. I actually have one coming up with Geisinger with a pediatric retina doctor." *Id.* at 10-11.  Mother explained, "I have to have transportation for" J.C.'s eye appointments. *Id*. at 11.   Mother testified that she has unsuccessfully tried to get transportation at no cost to and from the children's medical appointments.  *Id*. at 29-30.  Mother stated that, because of the family medical history, L.L. is also required to see an eye doctor annually. *Id*. at 12.   She testified that L.L.'s eye appointment was earlier in the same week as the subject proceeding, but "I did not have the finances to get there and back. I have to reschedule that appointment…." *Id*. at 12.

Similarly, Mother testified that she must pay for transportation to and from the children's pediatrician appointments, and she has not been able to get the children to "all of them." *Id*. at 31.  Mother stated that the children's medical appointments are "spread out[, and] what I will do is put some money aside specifically for those appointments." *Id*.  On inquiry by the trial court, Mother testified:

> Q.      You could take the bus. Right? The COLTS bus. It goes right past your house and right past [the pediatrician's office].
>
> A.      The thing is with the bus it takes so long. Sometimes they get there late[,] or I have to transfer, and [the bus] come[s] every hour…

*Id*.

By contrast, Mother stated that, in Largo, Florida, the buses "come every 30 minutes and they run all the way until midnight." ***Id***. at 32. Mother also testified that she is currently unemployed, but that her relatives are holding a position open for her in Florida. ***Id.*** at 5-6. The primary reason Mother sought relocation was to have more support for the Children:

> [G]iven the circumstances of me not having any family [in Pennsylvania], that's just the main thing. Not having the help and the extended hand that I need in order for me to be able to do what I need to do for my kids and myself.

***Id***. at 23.

While the Children did not testify, Mother presented significant uncontested evidence regarding their medical needs and how the relocation would ease Mother's burdens in addressing those needs. We emphasize that the court was not required to find Mother's testimony credible. But the court did not address this testimony at all. Instead, the court claimed there was no evidence presented on this issue. The record belies the court's finding.

Finally, Mother asserts the trial court abused its discretion with respect to its findings rendered under Section 5337(h)(10) ("Any other factor affecting the best interest of the child"). The trial court used this space to conclude that Mother's petition was untimely[7] for two interconnected reasons. First,

---

[7] The court order stated that Mother's petition was "denied without prejudice." No one suggests that this denial constituted anything but a final order following a hearing on the merits. The court's reference to timeliness and prejudice merely speaks to the court's rationale for its decision, as discussed ***infra***.

- 20 -

the trial court reiterated its prior conclusion that relocation was not financially feasible. **See** T.C.O. at 6 (citing 23 Pa.C.S.A. § 5337(h)(3) ("The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties."))[8] Second, the court reasoned that Mother's petition was "untimely," because Father's life was in flux.

The trial court stated:

> This court finds Mother's petition to be untimely. At the time of the hearing on September 29, 2022, Father had only been in law school for approximately five weeks. He will only be living in Rhode Island for the next three years. Father's plans are uncertain and subject to change. It would not be feasible for Father to maintain a meaningful relationship with the minor children if they are permitted to relocate to Florida. Neither party has the financial resources to travel back and forth to Florida. The court recognizes Mother's petition may become timely at another point in the future, whereby the court would be able to assess the feasibility of the proposed [re]location.

T.C.O. at 7-8 (style adjusted).

---

[8] Under Section 5337(h)(3), the court opined:

> Mother proposed allowing the Children to visit their Father in the summer and/or [during] school breaks. Unfortunately, the plan proposed is not feasible as neither party has the resources to transport the [] Children back and forth from the Largo, Florida area. Additionally, this court finds the distance to be an impediment to any realistic schedule.

**See** T.C.O. at 6.

The court's conclusion that "neither party has the financial resources to travel back and forth to Florida" was somewhat speculative. Contrary to the court's finding, there was no testimony elicited from Father regarding whether he could presently afford transportation costs. As discussed above, Father testified, "I try to supplement my income by driving Uber" in New York City on weekends, which provides weekend bonuses. *See* N.T., at 44, 46. When asked on direct examination why he opposes the relocation, Father did not discuss the increased transportation costs. Rather, he testified that it would be "a big disservice" to the children "not having their father around and be with them on, you know, a much closer basis." *Id*. at 51.

Still, common sense suggests that it would be more costly for the parties to exchange custody after relocation. The record indicated that Father is a full-time student with a part-time job; meanwhile, Mother is unemployed and struggles to afford transportation to doctors' appointments. That the parties might incur additional costs and hardship to facilitate custody exchanges is true in virtually every relocation case. *See, e.g., White v. Malecki*, --- A.3d ---, 2023 PA Super 102 (Pa. Super. June 9, 2023) (affirming the trial court's decision to allow the child to move to the father's home in Germany, but vacating the provision of the custody order obligating the mother to pay for nearly all the child's international custody exchanges).

However, when the trial court described Mother's petition as untimely and not feasible, the court was not suggesting that Mother's case would be more viable when it became more *economically* feasible for Mother and

Father to exchange custody. After all, the trial court recognized that Mother stood to gain a "significant" financial benefit upon relocation. *See* T.C.O. at 6. Rather, the court suggested that relocation would be better suited after Father graduated from law school. "[Father] will *only* be living in Rhode Island for the next three years. Father's plans are uncertain and subject to change." *See* T.C.O. at 7 (emphasis added). Therein lies the unreasonableness.

We note that Father, as the nonrelocating parent, already lives out of state. And, prior to Mother's relocation petition, he did not fully exercise his periods of partial custody, nor did he participate in the court-ordered reunification therapy with the older Child, L.L. It is unreasonable to force the Children to wait, for years – in a location where Father does not live, where the family has no ties, where the custodial parent has no support to care for her special needs child – until such time as Father decides where he will live and work, post-graduation. For these reasons, we conclude that the court's conclusions under Sections 5337(h)(10) and (3) also contributed to the unreasonableness of its decision.

When viewed as a whole, the trial court's conclusions and ultimate denial of Mother's relocation petition were unreasonable in light of the court's sustainable findings. As such, we conclude that the court committed an abuse of discretion. Given our disposition, we need not address Mother's final contention that the trial court erred when it failed to consider the Section 5328(a) factors. Indeed, Father concedes that the trial court did not have to consider these factors, because Mother's petition did not affect the form of

- 23 -

custody. ***See A.V. v. S.T.***, 87 A.3d 818, 824 n.4 (Pa. Super. 2014) (citing ***M.O. v. J.T.R.***, 85 A.3d 1058, 1063 (Pa. Super. 2014) (holding trial court need not address Section 5328(a) custody factors is modifying custody order, so long as modification does not affect the type of custody award)); ***see also*** 23 Pa.C.S.A. § 5323(a) ("Types of award").  Whichever way the trial court ruled on her petition, Mother would retain primary physical custody.

To conclude: the trial court did not commit an error of law when it declined to analyze Section 5337(h) in accordance with ***Gruber*** and its progeny.  ***Gruber*** has been superseded by Section 5337 of the Child Custody Act; specifically, the question of whether the child will benefit from the proposed relocation is independent from the question of whether the party seeking relocation will benefit. ***See*** 23 Pa.C.S.A. § 5337(h)(7) ***cf.*** (h)(6). However, the trial court's conclusions denying Mother's relocation petition were unreasonable in light of the sustainable findings.  No further proceedings under Section 5328(a) are necessary.  On remand, we direct the court to grant Mother's petition and enter an order setting forth an appropriate custody schedule.

Order vacated. Case remanded for proceedings consistent with this opinion. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/28/2023