J-S06030-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| KRISTEN BIERLY | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DANIEL T. PARKS | : | |
| | : | |
| Appellant | : | No. 2667 EDA 2023 |

Appeal from the Order Entered October 12, 2023
In the Court of Common Pleas of Bucks County Civil Division at No(s):
2022-60809

BEFORE:  DUBOW, J., McLAUGHLIN, J., and SULLIVAN, J.

MEMORANDUM BY McLAUGHLIN, J.:                    **FILED APRIL 30, 2024**

Daniel T. Parks ("Father") appeals *pro se* from the order awarding him joint legal and shared physical custody of E.T.P. ("Child") with Kristen Bierly ("Mother"). Father argues the court abused its discretion in weighing the custody factors, in considering certain testimony and evidence, in its choice of therapist for Child, and in requiring that the adult accompanying Child at custodial exchanges must be over 25 years of age. Father also argues the court was biased and/or prejudiced against him. We affirm.

Father and Mother began living together in 2007 and had Child in 2012. The parties separated in May 2022, and Mother filed a complaint in custody. Following a custody conference in June 2022, the parties agreed to an interim custody order giving Father physical custody of Child eight nights out of every two-week period and giving Mother six nights. The parties also agreed to participate in a custody evaluation through Court Conciliation and Evaluation

Services ("CCES") that summer. This resulted in a report issued in September 2022.

Following the issuance of the report, Mother moved for a custody trial, and the court held hearings on April 27, 2023, and September 18, 2023. At the conclusion of the April 27, 2023 hearing, at which Mother testified, the court ruled that the interim custody order be amended to give Mother an extra night of custody during each two-week period. This gave both parties 50% physical custody of Child.

At the September 18, 2023 hearing, Father testified. At the conclusion of the hearing, the court stated it thoroughly reviewed the CCES report, its notes from the April hearing, the custody conference officer's report, and the exhibits introduced during trial. N.T., 9/18/23, at 192.

The court then discussed the custody factors and found they weighed evenly between the parties. *Id.* at 193-207. It noted that neither parent was "particularly great at encouraging and permitting frequent and continuing contact" with the other parent, but that both have a "strong connection" with Child. *Id.* at 194. It observed that there was obvious animosity between the parties, but neither was abusive. *Id.* at 197-98. It found the parties have demonstrated the capacity to perform parental duties, could provide continuity, and are "interested in [Child]'s education and her family life and her community life." *Id.* at 198-99.

The court also noted that both parties have extended family and a half-sibling for Child, with the Child's significant contact with her maternal

grandmother weighing slightly in Mother's favor. *Id.* at 199. The court found Child's custody preferences difficult to discern, because she is worried about keeping the peace between her parents. However, the court "g[o]t the sense that she's okay with the current arrangement." *Id.* at 200-01.

The court found both parties are subtly disparaging of the other. However, it also found that both can maintain a loving, stable, consistent, and nurturing relationship adequate for Child's needs and recognize Child's emotional, developmental, and educational needs. *Id.* at 203-05. The court found that while Child might have had more continuity by continuing to live full-time in the parties' house, she had been successfully living at Mother's residence during Mother's custody time for over a year. *Id.* at 204. The court acknowledged that both parents are able to provide childcare arrangements, and credited Father with allowing Mother to see Child more often when he travels. *Id.* at 206. The court found that both parties are responsible for the level of conflict between them but are otherwise "reasonably nice people." *Id.* at 206-07. The court also noted that the shared custody arrangement was working, and that any significant change in the arrangement would require Child to console one of her parents. *Id.* at 209-11.

The court announced that it would be entering a final order maintaining the 50/50 physical custody arrangement. It directed the parties to submit a proposed custody order.

The court entered a final custody order on October 12, 2023, awarding the parties joint legal custody and shared 50/50 physical custody of Child. Of

note, the court ordered that each party could send an adult over the age of 25, known to Child, to perform custodial exchanges. It also ordered Child to begin therapy.

Father appealed.[1] He raises the following issues:

1. The Trial Court abused its Judicial Discretion and erred as a matter of law by not correctly applying the sixteen custody factors, 23 Pa.C.S.A. § 5328 -

    a. Failing to properly consider all credible testimony, evidence and argument which contradict its finding for a change in custody and which are not in the best interests of the child.

    b. Overrode and/or misapplied the law and/or exercised judgment which was manifestly unreasonable and not in the best interests of the child.

2. The Trial Court erred by allowing Unfair Prejudicial Evidence and issues covered by another matter - regarding allegations and testimony related to personal property.

3. The Trial Court erred in its reliance on the CCES Report's findings. First, the Report failed to properly consider credible information and evidence which contradict its finding. Second, the Report was outdated when used by the Trial Court. Third, the Report should be considered Hearsay.

4. The Trial Court erred in its Custody Order for Provision Number Three which ordered the age of adult allowed to pick up the parties' child during custody exchanges as twenty-five or older. The reasons for the Trial Court's ruling behind this decision are vague or not discernable from the record and this provision was finalized after the September 18, 2023 final hearing.

5. The Trial Court erred in its Custody Order for Provision Number Eight which ordered [Mother's] therapist to be used. The reasons

---

[1] Father's notice of appeal states he appeals from the interim order entered on April 27, 2023, and the final order entered on September 18, 2023. We have amended the caption to reflect that the appeal lies from the final order entered on October 12, 2023.

for the Trial Court's ruling behind this decision are vague or not discernable from the record and this provision was finalized after the September 18, 2023 final hearing.

6. The Trial Court abused its Judicial Discretion and violated Code of Conduct of United States Judges reaching a conclusion that is the result of partiality, prejudice, bias or ill will as shown by the evidence of record.

Father's Br. at 5-6 (reordered).

Our scope and standard of review over custody determinations is as follows.

We review a trial court's determination in a custody case for an abuse of discretion, and our scope of review is broad. Because we cannot make independent factual determinations, we must accept the trial court's finding that are supported by the evidence. The trial judge's deductions or inferences from its factual findings, however, do not bind this Court. We may reject the trial court's conclusions, but only if they involve an error of law or are unreasonable in light of its factual findings.

*Smith v. Smith*, 281 A.3d 304, 311 (Pa.Super. 2022) (citations omitted). An appellate court may not re-weigh the evidence or assess credibility, so long as the court's factual findings are supported by competent evidence of record and its conclusions are not unreasonable. *Carrero v. Lopez*, 300 A.3d 494, 501 (Pa.Super. 2023).

The polestar that guides any custody determination is the best interest of the child. *Smith*, 281 A.3d at 311. The court must determine the best interest of the child when ordering any form of custody "by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:"

- 5 -

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a). The trial court must determine "which factors are most salient and critical in each particular case." **Taylor v. Smith**, 302 A.3d 203, 207 (Pa.Super. 2023) (citation omitted).

## I.    The Custody Factors

Father argues the court abused its discretion in weighing the custody factors and awarding Mother 50/50 custody.[2, 3] Under Factor 1, Father argues he is more likely to encourage and permit contact with Mother than she is

---

[2] Within his first issue, Father also argues the court erred in amending the interim custody arrangement after the first day of trial. Father argues he had not yet testified, and Mother had not shown any change in circumstances warranting an immediate change to the interim order. Father argues this violated 23 Pa.C.S.A. § 5328 because the court had not yet fully addressed all the evidence or the custody factors.

We find this issue waived because it is not fairly suggested by Father's Rule 1925(b) statement, and the trial court did not address it in its opinion. **See** Pa.R.A.P. 1925(b)(4)(vii). Moreover, even assuming, *arguendo*, the court abused its discretion in this regard, this portion of Father's argument has been rendered moot by the court's subsequent entry of a final custody order following the completion of trial. **See E.B. v. D.B.**, 209 A.3d 451, 467 (Pa.Super. 2019) (finding court abused its discretion in entering interim custody order without holding a hearing, but holding interim custody order was rendered moot by final order, and vacating interim order and the ensuing proceedings would not be in child's best interest).

[3] To the extent Father's first issue also encompasses other arguments that are duplicative of those included in his other issues, we address them in the relevant sections of this memorandum.

likely to encourage contact with him. He asserts that Mother abruptly stopped "birdnesting" – *i.e.*, taking turns caring for Child in the home when it was their turn to exercise custody – after the parties had been doing so for more than a year. Father's Br. at 26. He also asserts he offered Mother the opportunity to take Child to church during his custody time, and she refused. Father further contends he agreed to let Mother take Child to Italy and to North Carolina, but Mother prevented him from going on vacation in 2022 and "nearly derailed" the plans in 2023. *Id.* at 28. Father states he also offered Mother custody of Child during any overnights when he was away on business.

Under Factor 2, abuse, Father argues that the record shows Mother is unable to control her anger, and that the court failed to consider "[M]other's documented aggressive actions as 'real' threats of violence." *Id.* at 24 (quoting N.T., 9/18/23, at 214 (court stating it only orders custody exchanges at police stations "when there's real threats of violence")). He argues the court disregarded the emails documenting Mother's aggressive incidents. *Id.* at 25.

Under Factor 3, parental duties, Father argues the court incorrectly stated, "I have no doubt that when you folks were together most of [the parental duties] were performed by [Mother]." *Id.* at 31 (quoting N.T., 9/18/23, at 198). Father contends this was not supported by the record, which shows he has worked from home during Child's life, while Mother worked outside the home. He also argues that because Mother works as a schoolteacher, Child's maternal grandmother cares for Child during much of Mother's custodial time.

Under Factor 4, stability and continuity, Father argues the court disrupted the stability and continuity he was providing by exercising primary custody under the interim order. He also asserts the court ignored that Mother removed Child from their home twice without his permission, and that one of these times, in 2013, she absconded with Child to New York and Father had to file for custody to secure her return. He also argues that Mother has a new baby whose father lives in New Jersey and who has a child from a previous relationship. Father contends that this arrangement may prompt Mother to move or abscond with Child again.

Under Factors 5 and 6, regarding extended family and sibling relationships, Father claims the court gave more weight to Child's relationship with her maternal grandmother than to her relationship with Father's older child – Child's half-brother – with whom Child has lived all her life. He argues the court erred in determining that the children have divergent interests, when the record shows they both love performing, singing, and riding bicycles together. He also claims the court abused its discretion in deeming their relationship unimportant because Child's half-brother has turned 18.

Under Factor 7, regarding the preference of the child, Father argues the court erred in discerning the Child was comfortable with the 50/50 custody arrangement because this was based on the CCES interview, which occurred when Father had primary custody under the interim order, and Mother's testimony, which was also taken when the interim order was in place. He cites

his testimony that after the court entered the interim 50/50 order, Child began suffering gastrointestinal issues due to stress.

Under Factor 8, regarding the attempts to turn the child against the other parent, Father argues the record supports a finding that Mother is more likely to disparage Father. He argues this is evidenced by the facts that Mother removed Child from the home she shared with her half-brother and that Mother has been aggressive toward Father during custody exchanges, while Father, for example, has offered to allow Mother to take Child to church.

Under Factor 9, regarding which party will maintain a loving, stable, and nurturing relationship with Child, Father argues that he is self-reliant and has kept a stable and loving home for both of his children, whereas Mother is reliant on others. He also asserts that Mother has abandoned Child's half-brother and maintains no contact with him after being a parental figure in his life for 15 years.

Under Factor 10, Father argues he is more likely to attend to Child's daily physical, emotional, and educational needs. Father points out that he takes care of Child during his custody time, whereas during Mother's custody time, Child's maternal grandmother cares for Child so that Mother can care for her newborn child.

Under Factor 11, the proximity of the parties, Father acknowledges that the parties live 10 minutes apart but reiterates that Mother has a history of unilaterally relocating. Father makes no argument under Factor 12.

Under Factor 13, the level of conflict, Father argues the record shows that the conflict between the parties is "self-inflicted chaos created by [Mother]." *Id.* at 47. He points out that Mother admitted to spitting on him and that she brought the police to his home to collect her personal property even though she had had an earlier opportunity to do so. He argues that he advocated for a police station as a custody exchange point to avoid further conflict. Father did not make argument under Factor 14.

Finally, under Factor 15, the mental and physical condition of a party or member of a party's household, Father argues Mother has a history of post-partum anxiety and depression. *Id.* at 50-51 (citing N.T., 9/18/23, at 124, 161, 173). He claims she struggles with anger issues, and again highlights that she spit on Father while allegedly holding Child in her arms. He argues the court's conclusion that Mother's issues "have either subsided or [are] being treated effectively" was not supported by the record. *Id.* at 51.

Father's foregoing arguments mostly take issue with the weight the trial court has assigned to the evidence or the custody factors, which we may not disturb. Regarding the issue of the Child's safety, to which the trial court must give weighted consideration, the court found there was no indication of any safety concerns for Child when in Mother's care, and Father has pointed to none. *See* Trial Court Opinion, filed 12/11/2023, at 6. Father argues that Mother spit at him once[4] and alleges she has suffered from post-partum

---

[4] Father introduced a text message from Mother in which she admits to doing so. *See* Ex. F-6.

- 11 -

anxiety and depression. However, Mother testified she is not experiencing any postpartum symptoms. N.T., 9/18/23, at 173. Father's citations to evidence of Mother's "aggressive incidents" are emails from Father regarding verbal arguments between the parties. *See* Exs. M-9, F-2, F-3, F-8.

Ultimately, none of Father's arguments convince this Court that the trial court's conclusion that the factors weighed even between the parties was unsupported by the record or that its decision to award the parties 50/50 custody was unreasonable.

## II. Testimony Related to Collection of Personal Property

Father argues the court erred in overruling his objection to Mother's testimony regarding her attempt to collect her personal property from the home after she left. He argues the testimony was irrelevant because Child was not involved in the incident, and Mother was not trying to collect any of Child's things. He also argues the testimony was inflammatory and prejudicial, as evidenced by the fact that the testimony made the trial judge so uncomfortable that he had to leave the courtroom to compose himself.

The trial court found this issue waived for vagueness. *See* Trial Ct. Op. at 11. We agree that this issue is not fairly suggested by the Rule 1925(b) statement of errors and is therefore waived. *See* Pa.R.A.P. 1925(b)(4)(vii).

Even if it were not waived, it is meritless. Relevant evidence is admissible, so long as its probative value is not outweighed by a danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay,

wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 402, 403.

Here, Mother testified that after she moved out of the residence, she arranged to collect her personal belongings. N.T. 4/27/23, at 62-63. On one of the days Mother had arranged to collect her belongings, she ordered a storage pod to be placed in the driveway and recruited friends to help move her grandmother's piano. *Id.* at 64.

Father objected to further evidence on this point, and the court overruled the objection. *Id.* at 65. Mother then testified that Father pulled his vehicle up to the front of the home, barricading the front door. *Id.* at 67. She also testified that she was unable to remove the padlocks from the storage pod because they had been filled with glue. *Id.* at 67-68.

The court then asked Father if he had parked his car there, which Father admitted, and if Father had anything to do with the lock damage, which Father denied. *Id.* at 69. There was then a five-minute recess in the proceedings, followed by an off-the-record conference. When court resumed, the court stated,

> I just want to make a record of what's occurred in the last 15 minutes. Candidly, I have some concerns about the way the car was parked. I do have some concerns about the locks, but I want to say this to you, sir. I have not made an evidentiary determination that you had anything to do with the locks. That would be unfair, I don't have any evidence of that. It's mildly suspicious, but it's not outcome determinative on the case. I'm not thrilled about the way the car was parked because it just shows a level of disdain for a pragmatic approach to solving the problem. And if there's anything [the trial court] is known for, it's

- 13 -

let's solve the problem. So that's where we are. So I want you to know I'm being candid with you, I have not made any decisions in this case, but that caused me some concern.

*Id.* at 69-70. Shortly thereafter, the court asked counsel to confirm for the record that it had not raised its voice during the proceeding, and that it was not "red in the face angry" or "slamming the table or trying to scare or intimidate anybody." *Id.* at 72. Both counsel agreed on the record.

The court did not abuse its discretion in overruling Father's objection. The testimony was relevant to the level of conflict between the parties and their ability to cooperate, which the court was required to consider. *See* 23 Pa.C.S.A. § 5328(a)(13). In addition, the testimony was not overly inflammatory, and the record reflects it did not cause the court to be prejudiced against Father.

## III. Reliance on the CCES Report

Father argues the court erred in accepting the findings of the CCES report. Father asserts the report does not account for Mother's anger and mental health issues. He also argues the report prematurely recommended 50/50 custody even though the interim order giving Father primary custody

had only been in effect for a few months. Father contends the court "outsourced" its custody determination to the report.[5, 6]

The parties stipulated to the admission of the report as evidence. *See* Order, 6/16/22, at 1-2. At trial, Father had the opportunity to present evidence to supplement the report or contradict it. Furthermore, the court acknowledged on the record that it was not permitted to outsource its decision-making responsibility to the CCES evaluators and stated it did not rely solely on the report when making its decision. *See* N.T., 9/18/23, at 192-93. This issue warrants no relief.

## IV.   Custody Exchanges

Father argues the court erred in refusing his request to allow Child's half-brother to accompany Child at custody exchanges, and instead ordering that the person accompanying Child must be over the age of 25. Father contends the court's decision is not based on Child's best interest or any relevant evidence, because this issue was not discussed until post-trial negotiations between counsel. He argues the provision is biased against Father and discriminatory against persons with disabilities, as Child's half-

_____

[5] In his Statement of Questions Involved, Father claims the court erred in considering the report because it contained hearsay and because it was outdated. Father has abandoned these arguments in the argument section of his brief.

[6] Father also argues the court should have interviewed Child, rather than relying on Child's alleged statements included in the report. This issue is waived. We have not located where he raised this issue below, and he has not cited where he did so. *See* Pa.R.A.P. 302(a); 2119(e).

brother has been diagnosed with ADHD. Father also argues the court erred in considering Child's half-brother's behavioral issues, because even Mother testified these issues have alleviated since he started high school.

First, this issue is waived. The certified record does not include documentation of when Father requested the trial court make Child's half-brother eligible to participate in custody exchanges. *See* Pa.R.A.P. 302(a). Although Father has appended his brief with his request to the court, we may only consider the certified record. *See **M.M. v. L.M.***, 55 A.3d 1167, 1177 (Pa.Super. 2012).

Moreover, even if it were not waived, the court's opinion explains that "[i]n light of the evidence offered from both parties, this [c]ourt determined that it would [be] in the best interest of [Child] to have a third-party handle custody exchanges to minimize hostilities and avoid unnecessary conflict with both parties." Trial Ct. Op. at 13. While the court does not explain why it set a 25-year minimum age requirement, Father has not demonstrated an abuse of discretion. Requiring an older adult to be responsible for Child during already-tense custody exchanges was not unreasonable.

## V.    Choice of Therapist

Father argues the court erred in ordering Child attend therapy with Mother's choice of therapist, rather than Father's. He points out that the trial court admitted in its opinion that it "split" the contested provisions between the parties. In Father's view, that amounts to a concession that it did not choose the therapist according to the best interests of the Child. He also

argues that the court erred in refusing Father's choice of therapist because that therapist had been providing therapy for Child's half-brother for years and is familiar with the family dynamics, which Father asserts will reduce conflict and is therefore in Child's best interest.

The court explained, "Given the animosity between the two parties, this Court found it necessary to choose a therapist that had no previous connections to either party[.]" Trial Ct. Op. at 13. It therefore found that Mother's choice of therapist "would be the most appropriate therapist and best suited for the interests of [Child]." *Id.* This was not unreasonable.

We also find no merit to Father's contention that the court disregarded Child's best interest when making this decision. The court explained that, following trial, counsel asked the court to "make a few final more minor decisions such as the identity of a counselor based solely on their submissions." *Id.* at 2. The court then "reviewed their positions on these more minor issues and nearly split these minor determinations in half, that is to say each party obtained some of what they requested in these minor determinations." *Id.* That statement does not prove that the court's choice of therapist was not made according to Child's best interests. The court specifically considered the fact Father's proposed therapist was involved with the family and determined that because of the degree of conflict, it would be better to have a therapist with no connection to either parent.

## VI. Bias and/or Prejudice

Father argues the record reflects the trial court was biased and/or prejudiced against him. First, he cites the court's characterization of his request to sequester Mother's sister, a potential witness, as "control games." Father's Br. at 56 (citing N.T., 4/27/23, at 9). He then claims that when he denied putting glue in the storage pod padlocks, the trial judge had to leave the courtroom in anger and compose himself. *Id.* at 50. Father also argues the court held against him that he asked for custody exchanges at the police station and characterized his attempt to document Mother's aggressive behavior in emails as "self-serving." *Id.* at 25 (quoting court at N.T., 9/18/23, at 210).

Father further argues the fact that the judge was biased is evidenced by the fact that the court made its decision to change custody to 50/50 part-way through trial, based on Mother's testimony and the CCES report, before Mother was cross-examined and before Father even testified. He points out the court stated, during the first hearing,

> And so it just seems, at least a baby step toward odd that we're here doing this when the reality is that Mom actually has more than 50 percent overnights if you count what she has by order and the times that she fills in. It's close anyway. And so because I'm a practical judge and because our court schedule is complicated and busy, it just seems to me that the case cries out for a resolution of 50/50.

*Id.* at 19 (quoting N.T., 4/27/23, at 71); *see also id.* at 13, 20, 51. Father contends the court then based the final order on the interim order and its

premature findings. Father also contends the court erred in stating that Mother already exercised custody approximately 50% of the time under the interim order, because he did not travel or miss any overnights between May 30, 2022, and January 10, 2023. ***Id.*** at 23 (citing N.T., 9/18/23, at 183-85).

Father also claims that the court rushed his cross-examination of Mother and his own testimony, and that when he testified, the court appeared disinterested. Finally, Father complains that the court did not allow the parties to submit written arguments at the end of trial.[7]

A court abuses its discretion if it enters a decision based on "partiality, prejudice, bias, or ill-will." ***In Int. of D.F.***, 165 A.3d 960, 966 (Pa.Super. 2017) (citation omitted).

We have reviewed the record and find that it does not support Father's allegation that the court's order was the result of bias or prejudice. Although the court stated during the first hearing that it believed a 50/50 custody split would be appropriate, it also stated that it would keep an open mind until the trial had concluded. N.T., 4/27/23, at 70-72. And while the court stated it disapproved of Father's handling of the incident when Mother attempted to collect her belongings from the house, it also stated it did not find the incident to be "outcome determinative on the case." ***Id.*** at 69-70. At the conclusion of trial, the court thoroughly and neutrally discussed the custody factors, and

---

[7] While Father argues that, in entering an order Father alleges was based on bias or prejudice, the court violated the code of conduct for federal judges, we note the court was not a federal court.

- 19 -

acknowledged that Father is "a good dad." N.T., 9/18/23, at 193-207, 210. In its opinion, the court states that it was not "motivated by anything other than entering a custody order in the best interests of [Child]." Trial Ct. Op. at 11.

In sum, the record reflects that the court carefully considered the evidence presented over two days of hearings, thoughtfully reviewed the custody factors, and made a reasoned decision to give the parties equal custody. It did not base its decision out of any partiality towards Mother or ill-will towards Father. The issue is unsupported.[8]

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/30/2024

---

[8] Father requests that the trial court be disallowed to hear future petitions relating to custody of Child. As this issue was not included in Father's Rule 1925(b) statement or his Statement of Questions Involved, it is waived.