J-A04037-26                    2026 PA Super 42

| JESSICA L. PEARSON | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. KYLE PEARSON | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1109 MDA 2025 |

Appeal from the Order Entered July 15, 2025
In the Court of Common Pleas of York County Civil Division at No(s):
2024-FC-001687-03

BEFORE:  PANELLA, P.J.E., KING, J., and LANE, J.

OPINION BY LANE, J.:                    **FILED: MARCH 4, 2026**

Jessica L. Pearson ("Mother") appeals from the order which awarded: sharded legal custody to her and Kyle Pearson ("Father") over their child, O.P. ("Child"); primary physical custody to Mother; and supervised physical custody to Father.  The order also imposed several requirements that Father must satisfy in order to enjoy unsupervised periods of custody with Child, including attending anger management classes and individual therapy sessions.  After careful review, we hold that the order violates the provisions of the Child Custody Act, **see** 23 Pa.C.S.A. §§ 5321-5340, to the extent that it includes additional provisions which would modify the existing custody award upon Father's completion of the requirements without any determination by the trial court of the best interest of Child based on the court's consideration of the custody factors set forth in section 5328(a).  Accordingly, we affirm in part and vacate in part.

The facts relevant to our disposition are as follows. Mother and Father married prior to Child's birth in July 2022. In May 2024, the parties separated. The trial court entered a stipulated custody order on October 24, 2024, granting the parties shared legal and physical custody. In December 2024, when Child was two and one-half years old, Mother petitioned for modification of the custody order on the basis that: (1) Mother is familiar with Father's anger issues because, prior to the parties' separation, Father broke furniture, cell phones, and windows on multiple occasions when he was angry; (2) during Mother's phone calls with Child during Father's periods of custody, Father frequently yells and screams at Mother and calls her inappropriate and derogatory names; (3) during custody exchanges, Father openly disparages Mother and screams at her; (4) since the entry of the October 2024 custody order, Child's behavior has deteriorated, and her aggression toward other children has escalated; (5) Child has started to repeat some of Father's inappropriate language; (6) Child reports that Father kicks the family dog; and (7) Father left Child alone during at least one of his periods of custody. *See* Petition for Modification, 12/19/24, at unnumbered 2-4. The trial court conducted a hearing on December 24, 2024. On December 27, 2024, the trial court entered a temporary custody order in which it maintained shared legal custody, but reduced Father's periods of physical custody of Child to supervised visits on two evenings per week and some weekends.

Mother filed another petition for modification in January 2025. On February 27, 2025, the trial court entered an interim custody order pending a custody trial in the matter. In its interim custody order, the court indicated that the terms and conditions of the December 27, 2024 temporary custody order were to remain in full force and effect, along with any terms and conditions of the October 24, 2024 stipulated custody order which do not conflict with the December 27, 2024 temporary custody order. **See** Trial Court Order, 2/27/25, at 3-4.

The matter proceeded to a custody trial on June 30, 2025, at which both Mother and Father testified, as well as other witnesses. Mother testified that she separated from Father because of his temper, which would cause him to engage in "screaming, name[-]calling, cursing, throwing things, punching things, breaking things." N.T., 6/30/25, at 26. Mother related that Father destroyed various types of property by, *inter alia*, kicking and breaking a television cabinet, punching a hole in a wall, throwing a post through a storm door window, and throwing a shop-vac through a carport window. **See id**. at 26-27. Mother expressed her concern about the effect of Father's temper on Child and indicated that she has seen him "lose his cool" with Child "a few times." **Id**. at 31. Mother described that "[t]ypically, [Father] would just yell [at Child] and tell her to stop or tell her she was acting like a baby for crying." **Id**. Mother related that Father also called Child a "loser" when she was two years old. **Id**. at 32. Mother testified that Father regularly uses foul language,

whereas Mother does not, and that Child has begun to repeat foul language. *See id*.

Mother indicated that Child has "a lot of challenges of regulating her emotions, and she can become aggressive at times." *Id*. at 32. Mother explained that "[o]ften when [Child] comes back from time with [Father], she states things like, Daddy hates me, or my daddy is . . . upset with me[, and she will] often have more challenging days at school where she's having extreme behaviors for a day or two." *Id*. at 64. Mother stated that Child "often can have [twenty-thirty] minute meltdowns where she's kicking and screaming" and that "she kicked a baby at daycare when she was having a tantrum." *Id*. at 33. Mother further testified that "[Child] is inconsolable. If you try to talk her through it, it generally increases the meltdown." *Id*. Mother noted that, "[d]uring our marriage and prior to marriage, [Father] very much advocated for corporal punishment" for Child. *Id*. at 36.

Mother discussed Father's significant marijuana use of "four to five times a day," failure to keep marijuana products and paraphernalia away from Child, and his fits of rage when Child would get ahold of the marijuana products or a glass bong or pipe and break it. *See id*. at 42. Mother also indicated that Father sold marijuana, and he was selling marijuana up to the time they separated, with people coming to their house to purchase it from him. *See id*. at 42-43. Mother testified regarding a road rage incident with Child in the vehicle, where Father cut off another vehicle, yelled, and drove erratically by

weaving in between other vehicles. *See id*. at 44-45. Mother explained that Father "very frequently would become upset when driving and flip people off, yell at them, curse, and proceed to cut them off or speed the remain[der] of the drive." *Id*. at 45.

Mother testified that Father would call her names, including a bitch, c**nt, stupid, ugly, fat and lazy during her FaceTime calls with Child. *See id*. at 46. On one occasion prior to their separation, Mother told Father that "if the outbursts and the name calling and yelling didn't stop, that I was going to leave. And [Father] proceeded to tell me if I took [Child] away from him, that he would kill my family, me, [Child], and then himself." *Id*. at 57. Mother indicated that Father "said that he would kill me a few other times if I ever took [Child] away from him or threatened to ruin my life." *Id*. Mother described Father's threats to kill her as "terrifying," and indicated that "his anger was so strong, and after our separation for quite a few months, it was - - I didn't know what he was capable of at that time because of how angry he was." *Id*. at 82. Mother indicated that Father has "hurt the dogs on multiple occasions." *Id*. at 82.

Mother also presented the testimony of Father's mother, Cherrlyn Donahue ("Ms. Donahue"). Ms. Donahue testified regarding Father's anger issues and explained that "we've had these issues for as long as I can remember with [Father]. He's always had a hair trigger temper." *Id*. at 95. According to Ms. Donahue, Father has a "very volatile personality" and that

"[t]o be around him is chaotic . . . if something sets him off, he gets very loud, verbally abusive." *Id*. at 93. Ms. Donahue continued, "if something would set him off, be that something about work, whatever, the raging would start. And even if it wasn't aimed at [Child], [she] still had to experience, you know, all that chaos and yelling and everything." *Id*. at 94. Ms. Donahue indicated that her primary concern is Child, and that "if [Child] would cry and not stop, [Father] would name-call her, like, quit being a baby, you're such a loser." *Id*. at 93-94. Ms. Donahue expressed her concerns about Child's safety when in Father's custody, and described his house as "unsafe" due to "guns laying on the kitchen table, to saws and blades and glass things out in the carport that would be dropped and broken . . . laundry everywhere, dirty dishes with mold . . . baby cups would . . . be filled with mold. It's just total chaos. It's not safe for a child." *Id*. at 95-96. Ms. Donahue also expressed concerns about drugs in Father's home and Child's exposure to his drug usage. *See id*. at 96. According to Ms. Donahue, "[Father] runs with a crowd of people that do drugs and smoke marijuana," and she has seen drug paraphernalia in his house, including bongs and blow torches used to smoke marijuana dabs. *Id*.

Mother also presented the testimony of Sydney Black ("Ms. Black"). Ms. Black testified that Father became enraged when he learned that someone had told Mother about the time he left Child alone in his home, and Father was attempting to discover who it was that had revealed this fact to Mother. *See id*. at 73.

The trial court also heard the testimony of Pauline Wallin, PhD ("Dr. Wallin"), a licensed psychologist who conducted a psychological examination of Father. Dr. Wallin concluded, *inter alia*, that "[f]uture physical attacks on people, whether intentional or unintentional, cannot be ruled out due to his poor self-control." *Id*. at 9; *see also* Exhibit 1. Dr. Wallin further testified that Father's profile is consistent with traits of having a personality disorder, and that his testing scores are consistent with people who are "immature, sarcastic, narcissistic, and self-indulgent," and at risk for overreacting. N.T., 6/30/25, at 10, 12. Dr. Wallin explained that such individuals "tend to misinterpret other people's motivations over suspicious distrusting and have difficulty maintaining a relationship. They tend to justify their own actions while blaming others and often having problems with authority." *Id*. at 12.

During Father's testimony, he conceded that he says things because he is angry or upset, and he regrets it. *See id*. at 115. Father additionally conceded that his anger gets the best of him and he has destroyed various types of property, including a piece of furniture by kicking it during an argument, breaking a window with a post, throwing a shop-vac through a carport window when he was angry, and punching a hole in a wall when he got angry and lost control. *See id*. at 129-130, 132, 145. Father also conceded that he a history of heavy marijuana use, and he failed a drug test for marijuana in 2024. *See id*. at 114, 144.

On July 15, 2025, the trial court entered the subject custody order which included the following provisions:

Pending completion of the requirements set forth below, Mother shall have primary physical custody of the Child. Father shall have partial physical custody of the Child. Father's periods of physical custody shall be supervised by Nichole Dwyer, Michelle Proper, Caitlin Shaffer or another mutually agreed supervisor which agreement shall not be unreasonably withheld. As long as Father's periods of custody are required to be supervised, he shall have custody of the Child on the first, second and fourth weekend of every month from Thursday at 6:00 p.m. until Saturday at 6:00 p.m., on every Monday from 5:00 p.m. to 8:00 p.m. and every Wednesday from 5:00 p.m. to 8:00 p.m.

Father must meet the following requirements in order to enjoy unsupervised periods of custody with the Child:

A. Provide independent documentation from the course provider showing that Father successfully completed an anger management training consisting of at least eight (8) sessions;

B. Provide independent documentation from the course provider showing that Father successfully completed additional anger management training consisting of at least eight (8) additional sessions[;]

C. Engage in individual therapy with a provider of Father's choice on a frequency as recommended by the treatment provider, with the treatment provider confirming Father's participation. Father shall provide a copy of Dr. Wallin's psychological evaluation report dated February 27, 2025 and a copy of this order to his individual therapist: and

D. Provide independent documentation from the individual therapy provider stating that in the provider's professional opinion, the risk of harm to the Child is such that Father's periods of physical custody should be unsupervised.

Beginning with Father's first regularly scheduled physical custody period **after he complies with Paragraphs A through D above, Father's periods of custody will be unsupervised**.

- 8 -

> ***The parties will enjoy an equally shared physical custody schedule*** based on a two-week rotation, with Mother having custody in week one from Sunday at 8:30 a.m. until Wednesday at 5:00 p.m. and in week two from Saturday at 8:30 a.m. until Wednesday at 5:00 p.m. and Father having custody in week one from Wednesday at 5:00 p.m. until Saturday at 8:30 a.m. and in week two from Wednesday at 5:00 p.m. until Sunday at 8:30 a.m.

Trial Court Order, 7/15/25, at 1-2 (emphasis, some capitalization, and punctuation added, unnecessary capitalization omitted).

Mother filed a timely notice of appeal from the custody order, as well as a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). The trial court thereafter authored an opinion pursuant to Rule 1925(a)(2)(ii).

Mother raises the following issue for our review: "Should this Court reverse the lower court's order that automatically converts the custody order from one with Father's limited supervised visits to equally shared physical custody upon Father's completion of therapy, without conducting an independent review of the child custody factors before the change in physical custody?" Mother's Brief at 2-3.

Our standard of review of a custody order is well-settled.

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as

- 9 -

shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

**H.R. v. C.P.**, 224 A.3d 729, 735 (Pa. Super. 2019) (*quoting* **V.B. v. J.E.B.**, 55 A.3d 1193, 1197 (Pa. Super. 2012) (citations omitted)).

The paramount concern in a child custody case is the best interests of the child based on consideration of all factors that legitimately affect the child's physical, intellectual, moral, and spiritual wellbeing. **See Landis v. Landis**, 869 A.2d 1003, 1011 (Pa. Super. 2005). Section 5323(a) delineates the types of custody that a trial court may award: (1) shared physical custody; (2) primary physical custody; (3) partial physical custody; (4) sole physical custody; (5) supervised physical custody; (6) shared legal custody; and (7) sole legal custody. **See** 23 Pa.C.S.A. § 5323(a). Importantly, section 5323 directs that the court may only award these types of custody "**after considering the factors set forth in section 5328** (relating to factors to consider when awarding custody) . . . if it is in the best interest of the child." **Id**. (emphasis added, unnecessary capitalization omitted). The mandate for the trial court to consider the section 5328 custody factors before entering any award of custody is reasserted in section 5328(a), which directs that "**in ordering any form of custody**, the court shall determine the best interest of the child by considering all relevant factors . . .." 23 Pa.C.S.A. § 5328(a).

The requirement that the trial court consider the custody factors set forth in section 5328(a) is not limited to the initial award of custody over a

child. Our courts have ruled that the trial court must consider and evaluate each of the section 5328(a) custody factors before changing or modifying any prior award of custody. *See E.D. v. M.P.*, 33 A.3d 73, 80 (Pa. Super. 2011) (holding that when deciding a petition to modify custody, a court must conduct a thorough analysis of the best interests of the child based on the section 5328(a) factors); *see also* 23 Pa.C.S.A. § 5338(a) (pertaining to modification of custody orders and requiring that the modification must "serve the best interest of the child"). This is because "child custody orders are temporary in nature and always subject to change if new circumstances affect the welfare of a child." *Holler v. Smith*, 928 A.2d 330, 331-32 (Pa. Super. 2007) (unnecessary capitalization omitted). Moreover, "[a] change in custody is just as important to the child and to others as an original award of custody, and the parties should be afforded the same type of hearing on the subsequent application as they are entitled to on an original award." *Clapper v. Harvey*, 716 A.2d 1271, 1275 (Pa. Super. 1998) (*quoting Rosenberg v. Rosenberg*, 504 A.2d 350, 353 (Pa. Super. 1986)).

In addition to a child's physical, intellectual, moral, and spiritual wellbeing, our General Assembly has prioritized the safety of children and emphasized their need for protection in custodial situations. As provided by section 5328(a), when considering the statutory custody factors, the trial court is required to give "***substantial weighted consideration to the factors*** . . . ***which affect the safety of the child***." 23 Pa.C.S.A. § 5328(a)

(emphasis added). Specifically, the trial court is compelled to give "substantial weighted consideration" to:

> (1) Which party is more likely to ensure the safety of the child.
>
> (2) The present and past abuse committed by a party or member of the party's household, which may include past or current protection from abuse or sexual violence protection orders where there has been a finding of abuse.
>
> (2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).
>
> (2.2) Violent or assaultive behavior committed by a party.

*Id*.at § 5328(a)(1)-(2.2).

As is applicable to the instant matter, after considering each of the section 5328 factors and giving "substantial weighted consideration" to the factors which affect the safety of the child, the trial court may order supervised custody if the court finds, *inter alia*, a present risk of harm to the child. **See** 23 Pa.C.S.A. § 5323(e)(1). In circumstances where the trial court has found such a present risk of harm to the child and has ordered supervised physical custody, such as in the present case, the court may impose safety conditions, restrictions, and safeguards to ensure the child's safety, including:

> **(e) *Safety conditions.***
>
> * * * *
>
> **(2)** If supervised contact is ordered, there shall be a review of the risk of harm and need for continued supervision upon petition of the party. The safety conditions, restrictions or safeguards may include any of the following:

**(i)** Nonprofessional supervised physical custody.

**(ii)** Professional supervised physical custody.

**(iii)** Limitations on the time of day that physical custody is permitted or on the number of hours of physical custody and the maximum number of hours of physical custody permitted per day or per week.

**(iv)** The appointment of a qualified professional specializing in programming relating to the history of abuse or risk of harm to provide batterer's intervention and harm prevention programming. Batterer's intervention and harm prevention programming may include programming designed to rehabilitate the offending individual, including prioritizing a batterer's intervention and harm prevention program, if available, or the impacts of physical, sexual or domestic abuse on the victim. The court may order an evaluation by the appointed qualified professional under this paragraph to determine whether additional programming is necessary.

**(v)** Limitations on legal custody.

**(vi)** Any other safety condition, restriction or safeguard as necessary to ensure the safety of the child or to protect a household member.

23 Pa.C.S.A. § 5323(e)(2).

Importantly, as set forth above, section 5323(e)(2) expressly provides that, "upon petition of the party" over which "supervised contact is ordered," the trial court "shall . . . review of the risk of harm and need for continued supervision." 23 Pa.C.S.A. § 5323(e)(2).

Notably, Mother solely challenges the provisions of the custody order which provide for the future modification of Father's award of custody from limited periods of supervised physical custody to equally shared unsupervised physical custody upon Father's completion of the specified requirements.

- 13 -

According to Mother, the custody order "allows for a drastic alteration of the physical custody schedule at some unspecified future date without any consideration of what the circumstances are surrounding the parties and the Child when the change occurs." Mother's Brief at 14 (unnecessary capitalization omitted). Mother asserts that, "no timeline was placed on when Father must complete his courses . . . and obtain the approval of his . . . therapist . . . thus, it is entirely possible that by the time Father 'completes' the conditions outlined in the order, any number of other relevant circumstances could warrant a court's reevaluation of the custody factors," such as:

> What if it takes a year for Father to get the approval from his own therapist, and in that time, Father resumes his substance abuse and continues to leave glass marijuana pipes strewn about his house? What if, by the time Father completes the conditions in the order, his work schedule changes and it would not be feasible for him to have the Child (unsupervised) for multiple overnight periods? What if, by the time Father gets the approval from his therapist, his driver's license is suspended, and he cannot lawfully operate a motor vehicle? What if, by the time he satisfies the court's conditions, he has a falling out with his friends, who he claims are his support network, and then has no support network?

*Id*. at 14-15 (unnecessary capitalization omitted, some capitalization added). Mother submits that "the possibilities for changed circumstances in the time it takes Father to satisfy the court's conditions are innumerable." *Id*. at 15 (unnecessary capitalization omitted).

Based on our review, we conclude that the portions of the subject custody order which provide for a modification of custody at some point in the

future — without any further involvement by the trial court — violate sections 5323(a), 5328(a), and 5338(a) of the Child Custody Act. As explained above, the trial court must consider and evaluate each of the section 5328(a) custody factors before changing or modifying any existing award of custody. ***See E.D. v. M.P.***, 33 A.3d at 80 (holding that when deciding a petition to modify custody, a court must conduct a thorough analysis of the best interests of the child based on the section 5328(a) factors); ***see also*** 23 Pa.C.S.A. §§ 5323(a), 5328(a). This mandatory requirement reflects the understanding that "child custody orders are temporary in nature and always subject to change if new circumstances affect the welfare of a child." ***Holler***, 928 A.2d at 331-32 (unnecessary capitalization omitted).

Here, the subject custody order includes provisions which permit modification of the existing award of custody without the trial court's involvement, let alone its determination of the best interest of Child based on a consideration of the section 5328(a) custody factors, giving substantial weighted consideration to the factors which affect the safety of the Child. Specifically, the order provides that "in order to enjoy unsupervised periods of custody with the Child" on "an equally shared custody schedule," Father need only "provide independent documentation" from "the course provider" and "the individual therapy provider." Order, 7/15/25, at 2. Thus, the order directs that custody will be modified at some point in the future, when Father completes his court-imposed requirements, without consideration by the trial

court of any of the section 5328(a) factors custody factors or the best interest of the Child based on the circumstances in place at that point in time. Accordingly, we conclude that the subject custody order violates sections 5323(a), 5328(a), and 5338(a).

We additionally observe that before the trial court may modify Father's custody from supervised physical custody to some other form of custody, the Child Custody Act requires additional action by Father and the trial court. As explained above, section 5323(e)(2) provides that "***[i]f supervised contact is ordered, there shall be a review of the risk of harm and need for continued supervision upon petition of the party***." 23 Pa.C.S.A. § 5323(e)(2) (emphasis added). The language of section 5323(e)(2) unquestionably contemplates that whenever the trial court orders supervised contact with a child, such supervised contact shall continue until such time as the party over which such supervision has been imposed files a petition for a review of the risk of harm the party presents to the child and the need for continued supervision. ***See id***. Necessarily, this language further contemplates that the trial court will thereafter undertake a review of the existing risk of harm that the party presents to the child and make a

corresponding determination as to whether there is a need for continued supervision of that party's contact with the child. *See id*.[1]

Here, the trial court clearly determined that Father poses a present risk of harm to Child such that all of his contact with Child must be supervised. *See* 23 Pa.C.S.A. § 5323(e)(1). The trial court further elected to impose safety conditions, restrictions, and safeguards on Father's periods of supervised physical custody to ensure Child's safety, including nonprofessional supervised physical custody, limitations on the time of day and the number of hours of Father's physical custody permitted per week, and the requirements that Father participate in anger management classes and individual therapy. *See* 23 Pa.C.S.A. § 5323(e)(2)(i), (iii), (vi). Thus, before the trial court may terminate Father's supervised contact with Child, Father must file a petition for review, and the trial court must conduct a hearing to review the risk of

_____

[1] Importantly, in a non-jury custody trial such as occurred herein, the role of the judge is to interpret the law, determine the facts, and apply the facts to the law for an eventual decision of the controversy. *See C.W. v. K.A.W.*, 774 A.2d 745, 749 (Pa. Super. 2001). The trial court may not delegate its judicial powers. *See id*. Notably, in the subject custody order, the trial court attempted to delegate its judicial powers to an independent therapy provider, to be selected by Father, by permitting the unknown therapist with unspecified qualifications, to determine whether "the risk of harm to [C]hild is such that Father's periods of physical custody should be unsupervised." Trial Court Order, 7/15/25, at 2. As section 5323(e)(2) makes clear, it is for the trial court to determine, upon petition by the party over whom supervised contact has been ordered, the risk of harm posed to the child by the party, and to determine whether there is a need for continued supervised contact. *See* 23 Pa.C.S.A. § 5323(e)(2).

harm posed to Child by Father and whether there is a need for his continued supervision, as required by section 5323(e)(2).

Accordingly, we affirm the July 15, 2025 custody order to the extent that it orders shared legal custody between the parties, primary physical custody to Mother, supervised physical custody to Father, and imposes requirements upon Father with which he must comply due to the risk of harm he presently presents to Child. However, we vacate all aspects of the order which provide for a future modification of the existing custody order upon Father's satisfaction of the requirements set forth in the order.

Order affirmed in part and vacated in part. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/4/2026

- 18 -