J-A10033-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| DEMETRIOS TSAROUHIS | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| MELANIE CATRICKES F/K/A MELANIE | : | No. 2689 EDA 2025 |
| TSAROUHIS | : | |

Appeal from the Order Entered September 19, 2025
In the Court of Common Pleas of Lehigh County Civil Division at No(s):
2011-FC-1577

BEFORE:   STABILE, J., LANE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                **FILED MAY 13, 2026**

Demetrios Tsarouhis ("Father") appeals the order entered by the Court of Common Pleas of Lehigh County granting in part and denying in part Father's motion for modification of the custody arrangement for the four children he shares with Melanie Catrickes ("Mother").  We affirm.

The parties have engaged in extensive acrimonious litigation regarding the custody of their 17-year old son, C.T. ("Son") and 15-year-old triplet daughters, S.T., D.T., and P.T. ("Daughters") (collectively "Children").  This Court previously summarized the factual background of this case as follows:

> Mother and Father were married in 2005, separated in 2011, and divorced in 2018. The separation was prompted by Mother's allegations that Father physically assaulted her in November 2011. Father denies the allegations, but pleaded guilty to Simple

_____

[*] Former Justice specially assigned to the Superior Court.

Assault on February 23, 2012, and agreed to a protection from abuse order on January 17, 2012. …

From 2012 to 2019, Mother and Father had shared legal custody, Mother had primary physical custody, and Father had partial physical custody of Children.

In July 2020, Mother filed a petition to modify custody requesting that Son be removed from her home and placed with Father. Mother also abruptly terminated Father's visitation with Daughters. This prompted numerous petitions for modification, contempt, and special relief over the next four years. According to Father, Mother had repeatedly called the police regarding Son from ages 8 to 12 years old, Son is happy in Father's home, and Son would like to participate in therapy and reunify with Daughters and Mother. According to Mother, Daughters disclosed that Father would sneak meat into their food even though they were vegetarians, crack Daughters' knuckles against their will, force them to watch R-rated movies when they were 6 years old, hit Daughters with a belt, lock Daughters in a room, tickle Daughters even though they asked him to stop, put Daughters' fingers up his nose, and made Daughters' sleep in bed with him in his underwear. Father denies most of the allegations, with the exception that he admits that he and Daughters would all watch movies in his bed when he was dressed appropriately. According to Daughters, Son threatened and physically hurt them when they were living together, including threatening to kill them in their sleep, pulling their hair, punching and kicking them, calling them names and teasing them, not letting them in his room, and turning off lights to scare them. Father and Son deny these claims. Father and Son would both like to have contact with Daughters.

In December 2020, the trial court appointed Ronald Esteve, Ph.D., to conduct a custody evaluation. Mother did not fully cooperate. Dr. Esteve was not able to produce a complete evaluation, but recommended reunification and co-parent therapy, prompting the court to order Mother to cooperate. In December 2021, the court appointed Otto Psychological Associates to provide reunification and co-parent therapy to the family. In February 2021, the court issued an interim custody order granting Father: sole legal and primary physical custody of Son and partial custody of Daughters. The court granted Mother: sole legal and primary custody of Daughters, and partial physical custody of Son. The parties continued to file numerous petitions. In March 2023, the court

ordered Otto Psychological Associates to commence reunification therapy.

In June 2023, the court appointed [a] guardian *ad litem* ("GAL") for Children. Mother initially refused to cooperate with the GAL, coached the Daughters, and secretly recorded the meetings between Daughters and the GAL. Mother also allowed Daughters to read the GAL's reports.

The court held hearings on June 22, 2023, July 10, 2023, July 17, 2023, August 14, 2023, September 14, 2023, October 5, 2023, October 30, 2023, and December 14, 2023, to resolve numerous outstanding petitions for modification, contempt, and special relief.

On January 26, 2024, after considering the 23 Pa.C.S. § 5328 custody factors and the best interest of Children, the trial court [judge, the Honorable Thomas M Caffrey,] entered a custody order, which awarded: 1) Parents shared legal custody of Children; 2) Father primary physical custody of Son; 3) Mother supervised physical custody of Son every other Saturday from 12:00 PM to 6:00 PM for six months supervised by a family therapy provider, then after six months partial physical custody of Son every other weekend with Daughters present; 4) Mother primary physical custody of Daughters; and 5) Father supervised physical custody of Daughters every other Saturday from 12:00 PM to 6:00 PM for six months supervised by a family therapy provider, then after six months partial physical custody of Daughters every other weekend with Son present. The court also ordered Mother and Father to enroll in co-parenting counseling and individual therapy, Children to continue or enroll in individual therapy, and everyone to participate in intense family therapy.

On the same day, the court found Father in contempt on two of Mother's contempt petitions and ordered him to pay an aggregate fine of $500. In turn, the court found Mother in contempt on five on Father's contempt petitions, which arose from Mother's refusal to permit Father to visit Daughters, as well as her ongoing refusal to participate in court-ordered co-parenting or reunification therapy. The court ordered Mother to pay $20,000 in attorney's fees to Father.

***Tsarouhis v. Catrickes***, 329 A.3d 669 (Pa.Super. 2024).

In its comprehensive and detailed decision including nearly twenty-seven pages of factual background, Judge Caffrey set forth the following conclusion about this contentious dispute:

> This is an extremely difficult and troubling child custody case that has involved ongoing acrimonious litigation for several years. In July 2020, Mother unilaterally removed C.T. from her home and terminated Father's custodial rights regarding Daughters. For the past three and one-half years, C.T. has lived with Father and has had no relationship with Mother, while Daughters have lived with Mother and have had no relationship with Father. Father has endeavored since July 2020 to re-establish his relationship with Daughters[.] His efforts have been thwarted by Mother, who claims she is only doing what is necessary to protect Daughters from Father and C.T., and by Daughters' unwillingness to see Father. Mother seeks no custodial time with C.T. and is content with the status quo.
>
> Both Dr. Esteve and Dr. Otto believed that this family was appropriate for reunification therapy, and the original plan—a solid one—was for all members to be involved in therapy prior to commencing reunification therapy. Father's ability to see and interact with Daughters was pu[t] on hold while Daughters worked through issues during therapy. Mother sabotaged the plan and let it be known that she has no intention of cooperating with reunification therapy. Therefore, other options must he explored.
>
> Maintaining the status quo is not appropriate. The undisputed expert testimony is that the status quo will place the Children at high risk of significant issues in their adolescence and adult life. Nor is removing Daughters from Mother's custody and placing them with Father an appropriate option. While the Court finds that Mother has, in fact, alienated Daughters from Father as well as C.T., there is a significant risk of emotional harm to Daughters should they be abruptly uprooted from their current environment.

Trial Court Opinion (T.C.O.), 1/26/24, at 43-44. On February 9, 2024, Judge Caffrey directed that co-parenting counseling, individual counseling, and intense family therapy be provided by Hearthfire Psychology ("Hearthfire").

Father filed an appeal of the trial court's January 26, 2024 order.[1]  On October 20, 2024, this Court affirmed the January 26, 2024 custody order, adopting Judge Caffrey's comprehensive and well-reasoned opinion and finding no abuse of discretion in the custody award or contempt sanctions.[2] **Tsarouhis**, 329 A.3d at *4-5.

During the pendency of the appeal, the terms of the January 26, 2024 custody order were never implemented.  Hearthfire informed the parties that it was unable to conduct the supervised partial physical custody mandated in the January 26, 2024 order.  When Father petitioned the trial court for clarification as to which family provider would supervise each party's periods of supervised partial physical custody and the parameters of such supervision, the trial court entered an order on May 10, 2024, indicating it could only "clarify" the order by modifying the custody order after the appeal was no longer pending. Order, 5/10/24, at 2, n.1.

_____

[1] Mother also filed an appeal from the January 26, 2024 order, but it was ultimately dismissed due to Mother's failure to file her appellate brief and reproduced record.

[2] However, President Judge Emeritus Jack Panella authored a concurring statement, highlighting that Judge Caffrey had made the following observation: "[t]he Court is keenly aware of Mother's refusal to follow the previous custody orders, and there is certainly the risk that she will continue to refuse to do so.  Should Mother continue to refuse to follow the custody order entered contemporaneously herewith, the Court will consider removing Daughters from her custody."  T.C.O., 1/26/24, at 45, n. 26.  P.J.E. Panella emphasized that given that Judge Caffrey's findings were supported by the record, he would support the removal of Daughters from Mother's custody if she continued her pattern of contempt for the trial court's orders. **Tsarouhis**, 329 A.3d 669 (concurring statement, Panella, P.J.E.).

After the resolution of the appeal, on September 17, 2024, Mother filed a petition for modification of the January 26, 2024 custody order, asking that family therapy be suspended and Daughters be permitted to engage in independent counseling. On November 21, 2024, Father filed a petition for modification of custody order, seeking sole legal and physical custody of all four Children.[3] Both parties also filed multiple contempt petitions against each other for failing to comply with various court orders.

This case was reassigned to the Honorable Douglas G. Reichley, who held multiple custody hearings on June 10-12, 2025, June 25, 2025, and August 20, 2025 at which parties offered the testimony of multiple witnesses; the trial court also conducted *in camera* interviews of the four Children.

Father testified on his own behalf, claiming Mother has failed to comply with the trial court's orders by prohibiting him from seeing or speaking to Daughters, preventing Daughters from participating in therapy, and refusing to provide Father any information to allow him to be involved in decisions regarding Daughters' health, education, or religious practices. N.T., 6/20-25, at 137. Father claimed he brought Son to Mother's house for her to have visitation with Son, but Mother answered through the Ring doorbell camera that she was not able to see Son. *Id.* at 138.

_____

[3] On November 21, 2024, Mother obtained a temporary Protection from Abuse (PFA) order against Father on behalf of Daughters. After a two-day hearing at which the Daughters testified *in camera*, the trial court entered an order on January 27, 2025, dismissing the temporary PFA after finding Mother had not presented sufficient evidence to support any relief.

Father presented the testimony of Dr. Jae Kierstin Carreria, who was employed by Hearthfire when the parties were ordered to submit to family therapy. Dr. Carreria testified that Daughters' therapy sessions were repeatedly postponed as Mother refused to complete paperwork for Daughters to begin their sessions. N.T., 6/11/25, at 25-28. Mother told Dr. Carreria that her therapist told her to not engage in co-parenting counseling. *Id.*

Dr. Carreria testified that when Daughters finally arrived at her office for a session on November 14, 2024, Dr. Carreria noted that one of the girls was smiling at her and remained smiling when she saw Father in the waiting room. When Mother questioned Dr. Carreria as to why Father was there and Dr. Carreria informed Mother that Father had a right to be there, Mother ran out of the room and Daughters followed her. *Id.* at 39. Dr. Carreria also introduced subsequent emails Mother sent to her, accusing Dr. Carreria of "deepening [Daughters'] trauma" as they had not expected Father to be there; Mother threatened to report Dr. Carreria for unethical practices and unprofessional conduct. *Id.* at 41-49. Thereafter, Dr. Carreria sought to withdraw from the parties' case, claiming that despite her best efforts, she had no opportunity to engage with the participants in a therapeutic capacity, largely due to objections by Mother. *Id.* at 51.

Dr. Tracy E. Hill and the staff of Hill and Associates, LLC, testified that Daughters were required to participate in court-ordered counseling for family reunification purposes. N.T., 9/20/25, at 14-15. Dr. Hill reported that all three Daughters refused to communicate with their therapists in their separate

appointments; Dr. Hill found that Daughters' non-engagement appeared to be deliberate and "orchestrated," suggesting that they had been coached into refusing to participate in any therapy. *Id.* at 16-32. Daughters' therapy was canceled due to their unwillingness to participate. *Id.* at 17.

Father's expert on parental alienation, Carol Gottlieb, opined that Mother had alienated Daughters from Father; Gottlieb found Daughters' resistance to even seeing Father was evidence that Mother had instigated this behavior, given there was evidence that Father and Daughters had a good relationship prior to their separation. N.T. 6/12/25, at 30. Gottlieb found the timing of Daughters' allegations of Father's abuse was "highly characteristic of alienation" as Daughters made these revelations right after Mother had been briefly imprisoned for failing to pay court-ordered counsel fees to Father and Father was about to regain contact with Daughters. *Id.* at 21-23. Gottlieb noted that Daughters had never reported the abuse to any of the numerous mental health professionals, judges, or school officials that they had interacted with during the decade long custody dispute. *Id.*

Mother also testified on her own behalf, claiming that she did not let Daughters visit with Father as there was no designated supervisor for the visitation. N.T., 6/25/25, at 73-74. Mother argued that Father had failed to foster Son's relationship with her, presenting evidence that Son has refused to return her text messages for multiple years. *Id.* at 85, 103-111. Mother denied Father's claims that Mother had refused to see Son at her home, claiming that this event never occurred. *Id.* at 121-22.

With respect to the allegations that Mother had encouraged the Daughters to avoid therapy at Hearthfire, Mother asserted that she was assured by Hearthfire personnel that Daughters would only be meeting with therapists and not their father. *Id.* at 98. Mother testified that Daughters immediately ran upon seeing Father and began "freaking out" and angry that they were lied to about Father's presence at the appointment. *Id.* at 98-99. Mother also presented the expert testimony of Dr. Jean Mercer, who opined that Daughters' resistance to seeing Father illustrated their avoidance of an abusive parent. N.T., 6/11/25, at 128, 183.

On September 19, 2025, the trial court granted Father's motion to modify the custody agreement in part, awarding the parties shared legal custody as to all four Children, along with primary physical custody of Son to Father, and primary physical custody of Daughters to Mother. The trial court also granted Father partial physical custody of Daughters every other weekend from Friday afternoon after school until Monday morning at designated times while granting Mother the same partial physical custody arrangement of Son. However, the trial court conditioned the partial physical custody on the requirement that another adult be present during the entire period.

Further, the trial court granted in part Father's contempt motions and denied all of the parties' remaining motions.[4] The trial court found Mother in contempt for impeding Daughters' court-ordered treatment by Hearthfire and

_____

[4] The trial court addressed twenty-three petitions filed between the parties.

directed Mother to pay Father's counsel $1,000.00 in counsel fees. The trial court also found Mother in contempt of its June 26, 2025 order directing her to present Daughters to Hill and Associates for an intake evaluation and ordered Mother to pay $1,500.00 to Father's counsel. The trial court found Mother "engaged in conduct for the purpose of frustrating the completion of the intake evaluation by Hill and Associates." Order, 9/19/25, at 4.

On October 17, 2025, Father filed this appeal along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

Father claims the trial court abused its discretion in entering the custody award in 1) awarding Mother primary physical custody of Daughters, 2) imposing supervised physical custody without identifying a present child-specific safety risk, and 3) separating the siblings without compelling reasons.

As Father's issues are interrelated, we will consider them together. In doing so, we begin with our scope and standard of review:

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

- 10 -

*D.K. v. S.K.*, 102 A.3d [467, 478 (Pa. Super. 2014))] (citation omitted).

The abuse of discretion standard is highly deferential to the trial court. The evidentiary record of a custody appeal will often support a conclusion different than the one reached by the lower court. In a custody appeal, the sheer fact that a trial court could have found for the appellant is not a sufficient basis to reverse the court's decision. Deference must be given to the trial court, who viewed the parties, the witnesses, and the evidence firsthand. *D.K.*, 102 A.3d at 478. It is not the role of this Court to "re-find facts, re-weigh evidence, and re-assess credibility." *Wilson v. Smyers*, 284 A.3d 509, 520 (Pa. Super. 2022) (citation omitted). Our role is simply to review the record in light of the trial court's findings. We must accept the findings of the trial court, so long as those findings are supported by competent evidence of record. *Wilson*, 284 A.3d at 515. Deferential though it is, this standard of review permits this Court to make our own inferences and deductions. "Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record." *D.K.*, at 478.

*Carrero v. Lopez*, 300 A.3d 494, 501 (Pa. Super. 2023).

In reviewing the trial court's decision to modify the parties' custody arrangement, we are guided by the following principles:

The paramount concern in a child custody case is the best interests of the child based on consideration of all factors that legitimately affect the child's physical, intellectual, moral, and spiritual wellbeing. *See Landis v. Landis*, 869 A.2d 1003, 1011 (Pa. Super. 2005). Section 5323(a) delineates the types of custody that a trial court may award: (1) shared physical custody; (2) primary physical custody; (3) partial physical custody; (4) sole physical custody; (5) supervised physical custody; (6) shared legal custody; and (7) sole legal custody. *See* 23 Pa.C.S.A. § 5323(a). Importantly, section 5323 directs that the court may only award these types of custody "*after considering the factors set forth in section 5328* (relating to factors to consider when awarding custody) ... if it is in the best interest of the child." *Id*. (emphasis added, unnecessary capitalization omitted). The mandate for the trial court to consider the section 5328 custody factors before entering any award of custody is reasserted in section 5328(a), which directs that "*in ordering any form of*

- 11 -

*custody*, the court shall determine the best interest of the child by considering all relevant factors ...." 23 Pa.C.S.A. § 5328(a).

The requirement that the trial court consider the custody factors set forth in section 5328(a) is not limited to the initial award of custody over a child. Our courts have ruled that the trial court must consider and evaluate each of the section 5328(a) custody factors before changing or modifying any prior award of custody. *See E.D. v. M.P.*, 33 A.3d 73, 80 (Pa. Super. 2011) (holding that when deciding a petition to modify custody, a court must conduct a thorough analysis of the best interests of the child based on the section 5328(a) factors); *see also* 23 Pa.C.S.A. § 5338(a) (pertaining to modification of custody orders and requiring that the modification must "serve the best interest of the child"). This is because "child custody orders are temporary in nature and always subject to change if new circumstances affect the welfare of a child." *Holler v. Smith*, 928 A.2d 330, 331-32 (Pa. Super. 2007) (unnecessary capitalization omitted). Moreover, "[a] change in custody is just as important to the child and to others as an original award of custody, and the parties should be afforded the same type of hearing on the subsequent application as they are entitled to on an original award." *Clapper v. Harvey*, 716 A.2d 1271, 1275 (Pa. Super. 1998) (*quoting* *Rosenberg v. Rosenberg*, 350 Pa.Super. 268, 504 A.2d 350, 353 (1986)).

*Pearson v. Pearson*, ___A.3d___, 2026 PA Super 42, at *4-5 (Pa.Super. Mar. 4, 2026) (emphasis in original).

The trial court's award in this case limited the parties to have supervised physical custody of the children with whom they do not currently live. Supervised physical custody is defined as "[c]ustodial time during which an agency or an adult designated by the court or agreed upon by the parties monitors the interaction between the child and the individual with those rights." 23 Pa.C.S.A. § 5322.

This Court has recognized that:

In addition to a child's physical, intellectual, moral, and spiritual wellbeing, our General Assembly has prioritized the safety of

- 12 -

children and emphasized their need for protection in custodial situations. As provided by section 5328(a), when considering the statutory custody factors, the trial court is required to give "***substantial weighted consideration to the factors*** … ***which affect the safety of the child***." 23 Pa.C.S.A. § 5328(a) (emphasis added). Specifically, the trial court is compelled to give "substantial weighted consideration" to:

> (1) Which party is more likely to ensure the safety of the child.
>
> (2) The present and past abuse committed by a party or member of the party's household, which may include past or current protection from abuse or sexual violence protection orders where there has been a finding of abuse.
>
> (2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).
>
> (2.2) Violent or assaultive behavior committed by a party.
>
> ***Id***.at § 5328(a)(1)-(2.2).

***Pearson***, ___ A.3d___, 2026 PA Super 42, at *5. As such, after the trial court considers each of the Section 5328 factors and gives "substantial weighted consideration" to the factors which affect the safety of the child, the trial court "may order supervised custody if the court finds, *inter alia*, a present risk of harm to the child." ***Id.*** (citing 23 Pa.C.S.A. § 5323(e)(1)).

Specifically, Father argues that the trial court abused its discretion in awarding Mother primary physical custody of Daughters when the trial court had credited expert testimony that Mother had engaged in contemptuous conduct in "orchestrating" their refusal to participate in court-ordered therapy, deliberately obstructed family reunification efforts, and ultimately alienated Daughters from Father.

Father also claims that the trial court abused its discretion in requiring that the parties' periods of partial physical custody be supervised, arguing there was no competent evidence that he presented a risk of harm to Daughters while they are in his custody.

After giving the parties ample opportunity to present evidence, the trial court issued a detailed and well-reasoned opinion, thoroughly discussing each of the Section 5328(a) factors. The trial court acknowledged Father's concerns and expressed strong disapproval of Mother's efforts to estrange Daughters from Father and to avoid compliance with court-ordered therapy:

> The Court is acutely aware of the potential detrimental impact upon both parties and their children by altering the current custodial arrangements, but also finds it incongruous to in effect award Mother for her defiant contravention of multiple court orders in this case. The Court recognizes Father has been assigned a designation as indicated for sexual abuse of the three [Daughters], but the Court has not found those allegations were credible both in the PFA case and in this custody case.
>
> In evaluating the allegations against Father, the Court has weighed the testimony of the three daughters, Mother, the OCYS caseworker, and Mother's expert psychological expert who rejected the conclusion [that] the three daughters were being alienated from Father by Mother. Separately, the Court has considered the testimony of Father, [Son], and Father's mental health expert witness Carol Gottlieb who opined that the three daughters are being alienated.
>
> However, the most telling evidence came from the testimony of the mental health professional at Hearthfire who was threatened by Mother with professional licensing sanctions, from the staff at Hill and Associates who concluded that Mother was coaching the three girls in their refusal to participate in court-ordered treatment, and the report from the Guardian *ad litem* who recounted Mother's unilateral pursuit of deliberately disobeying court orders to forestall the initiation of counseling for the three

- 14 -

daughters. The GAL reported how Mother time and time again enrolled the daughters with treatment providers of her own choosing without notifying Father's counsel, the guardian *ad litem*, or the Court. Mother surreptitiously recorded a telephone call with the GAL and interfered in the GAL's attempt to interview the three Daughters. In the end, as the GAL commented, the majority of mental health professionals who have been involved in this case concluded that if something does not happen with the current custodial arrangements, nothing will change.

T.C.O., 9/19/25, at 7-8.

However, in weighing the factors set forth in Section 5328, the trial court found that the majority of the factors were neutral in that neither party was favored. While the trial court was highly critical of Mother, focusing on her pattern of alienating Daughters from Father and in frustrating compliance with the trial court's orders, the trial court determined that both parties had engaged in harmful behavior that "succeeded in undermining any shred of affection the [C]hildren have for the opposite parent." T.C.O., 9/19/25, at 5.

Although Mother did not present any evidence of Father's attempts to alienate Son from Mother, the trial court expressed concern after hearing Son's aggressive language and observing his affect when he described Mother in his *in camera* interview with the trial court. *Id.* at 5-6. The trial court observed that Son "expressed his antagonism towards his mother with such vehemence" and "uses almost the same words [that] Father chooses when describing Mother." *Id.* at 5. The trial court determined that "the parties have so warped the emotional and mental health of their four children that is seemingly impossible for the Children to utter any positive comment regarding the parent with whom they do not live." *Id.* As such, the trial court

- 15 -

concluded that the parties' "hatred for each other has been embedded in the Children with whom they live to such a degree that the Children have been thoroughly alienated against the other parent." T.C.O. at 7.

Similarly, the trial court found that neither parent had demonstrated they could provide stability or continuity in developing Children's maturity or judgment, given that "each parent has undermined any sense of stability the Children could have had by painting the other parent in such grotesque terms that it is not possible for any semblance of normalcy to occur in the lives of the Children" or for the Children to reach "their own conclusions about the extent of any relationship they wish to have with the other parent." *Id.* at 4. The trial court expressed concern for the level of conflict between the Parties and their unwillingness to cooperate with each other, finding the "sheer level of hostility each parent directs towards the other [which] renders each of them incapable of fostering an environment in their respective homes which is conducive for even the slightest resemblance of co-parenting." *Id.* at 7.

To the extent that Father challenges the trial court's decision to award the parties' supervised physical custody, he is not entitled to relief. Although Father correctly notes that the trial court found Daughters' allegations of sexual abuse to be not credible, the trial court deemed valid the general protective services (GPS) referrals made against Father alleging inappropriate discipline. The trial court also considered that Father had pled guilty to simple assault in relation to allegations that he had physically assaulted Mother.

Further, the trial court was tasked with modifying an unusual existing arrangement in a highly contentious custody dispute in which Mother has had sole physical custody of Daughters, Father has had sole custody of son, and Daughters have refused to see Father for over five years, and Son has refused to see Mother. The trial court emphasized that "neither parent has had an opportunity to demonstrate how they would ensure the safety of the children for whom they do not live." *Id.* at 1, 2, 16.

Further, we are not persuaded by Father's argument that the trial court's custody arrangement is not in Children's best interests as it does not specifically provide time Children to interact with their siblings. In reaching its decision, the trial court did recognize that Son and Daughters would benefit from having a familial relationship with each other, but highlighted the current tension between the Children.

As noted above, the trial court conducted *in camera* interviews with the Children in which it learned that while Daughters get along reasonably well, "[D]aughters have ostracized their brother and refuse to even acknowledge his presence in the school where he is a student with the three girls." T.C.O., 9/19/25, at 9. Given that Son has been physically and emotionally isolated from his sisters, Son has not had the opportunity to foster a relationship with his sisters. Nevertheless, the trial court reasoned that "under the existing circumstances where the three daughters do not desire to interact with their brother, … forcing the four children to inter-mingle at this junction while partial

custody is just starting to be exercised would not be in their best interests."[5] T.C.O. 11/10/25, at 9.

Upon reviewing the record and applying deference to the trial court's credibility determinations, we find there is evidence to support the trial court's findings on each of the Section 5328(a) factors and will not reweigh the evidence presented before the trial court. Our standard of review makes clear that "with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand." *D.K.*, 102 A.3d at 478. Thus, we cannot find the trial court abused its discretion in allowing Mother to maintain primary physical custody of Daughters at this point in time and limiting each parent to supervised partial physical custody of the children with whom they do not live. Accordingly, we affirm the trial court's order entering the modified custody arrangement.

Order affirmed.

_____

[5] This Court has held that:

> Although the express wishes of a child are not controlling in custody decisions, such wishes do constitute an important factor that must be carefully considered in determining the child's best interest. The weight to be attributed to a child's testimony can best be determined by the judge before whom the child appears. The child's preference must be based upon good reasons and his or her maturity and intelligence must also be considered.

*Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa. Super. 2006) (internal citation and quotations omitted).

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>5/13/2026</u>